**INTERNATIONAL MINERALS AND MINING CORPORATION, a New Jersey corporation, Plaintiff,**

v.

**CITICORP NORTH AMERICA, INC., a Delaware corporation and Citibank, N.A., a national banking corporation, Defendants.**

**Civ. A. No. 89–1638(MTB).**

United States District Court, D. New Jersey.

April 27, 1990.

Ruskin, Kors, Meltzer, Rubin & Starr by Arnold R. Gerst, Jersey City, N.J., for plaintiff.

Ross & Hardies by Helen Davis Chaitman, Somerset, N.J., for defendants.

## OPINION

BARRY, District Judge.

## I. INTRODUCTION

This is a lender liability case. Plaintiff International Minerals and Mining Corporation ("IMMCO") filed this action against Citicorp North America, Inc. and Citibank, N.A. (collectively "Citicorp") alleging that Citicorp improperly denied IMMCO's request for a twenty million dollar loan, the proceeds of which IMMCO had intended to use to purchase an anthracite coal operation in Northeastern Pennsylvania.

IMMCO's complaint purports to set forth causes of action for breach of contract (Count I); fraud and misrepresentation (Count II); malicious and negligent breach of contract (Count III); breach of fiduciary duty and the covenant of good faith and fair dealing (Count IV); promissory and equitable estoppel (Count V); violation of the New Jersey Consumer Fraud Act, N.J. S.A. 56:8–1 et seq. (Count VI); outrageous conduct (Count VII); and "wilful, wanton, gross and intentional" conduct (Count VIII). IMMCO also seeks recovery of the attorney's fees and costs associated with bringing this action (Count IX).

Now before the Court is Citicorp's motion for summary judgment on all of the counts set forth in the complaint. Citicorp has also moved for sanctions pursuant to Federal Rule of Civil Procedure 11. For the reasons set forth below, Citicorp's motion for summary judgment will be granted in its entirety. The motion for sanctions will be denied.

## II. FACTS

IIa. *Background*

IMMCO, a corporation organized under the laws of New Jersey, is in the business of locating and developing anthracite coal reserves. In late 1986, IMMCO's principals, Abraham Bosman ("Bosman") and Steven Fotos ("Fotos") were informed that the owners of an anthracite coal mine near Wilkes Barre, Pennsylvania were interested in selling the assets of their company. The mine, known as the Silverbrook Anthracite mine, was owned and operated by a group of four half-brothers known as the Casey–Kassas. Fotos and Bosman learned of the opportunity to purchase the assets of the mine from Michael Faleski, an individual whom they knew well and with whom they had prior dealings.

Faleski was familiar with the Casey–Kassas operations and believed that the family's asking price of approximately $18 million was significantly lower than the true value of the assets, which he estimated as being between $50 to $70 million. Faleski believed that the purchase of the assets would be a "steal", and so advised Bosman and Fotos. *See* Deposition of Michael Faleski, sworn to August 3, 1989 (hereinafter "Faleski Dep.") at pp. 35–36, 47, 55; Citicorp Movant Brief at p. 3.

Thereafter, Bosman, Fotos, and Faleski decided to undertake the purchase together and formed a shell corporation known as Silverbrook Industries, Inc. to hold the assets. *See* Deposition of Stephen Fotos, sworn to July 31, 1989 (hereinafter "Fotos Dep.") at p. 12. IMMCO, which was to be the chief negotiator for the purchase of the properties, was to be a shareholder of two-thirds of Silverbrook Industries. *Id.;* Citicorp Movant Brief at 4.

Bosman, Fotos and Faleski are all sophisticated businessmen. Prior to the transac-

tions at hand, Bosman had, *inter alia,* served as President and Chief Operating Officer of a multi-million dollar publicly held corporation and been an area director of the National Community Bank. *See* Deposition of Abraham Bosman, sworn to August 2, 1989 (hereinafter "Bosman Dep.") at pp. 5, 25. Fotos has had extensive experience in the shipping and trading of coal throughout the world. *See* Fotos Dep. at pp. 6–7. Faleski has been in the business of leasing and supplying machinery to coal processing companies for several years. *See* Faleski Dep. at pp. 19, 21, 35.

IIb. *The Application Process: An Overview*

In February, 1987, Bosman and Fotos met with Carl Toriello ("Toriello") and Nicholas Goumas ("Goumas") in Citicorp's offices in Englewood Cliffs, New Jersey.[1] Toriello and Goumas both served as vice presidents of Citicorp, and had the initial responsibility for handling IMMCO's attempt to structure a loan for the purchase of the assets. *See* Affidavit of Carl Toriello, sworn to January 16, 1990 (hereinafter "Toriello Aff.") at ¶ 1; *see also* Deposition of Carl Toriello, sworn to November 21, 1989 (hereinafter "Toriello Dep.") at p. 7.

As will become evident below, Toriello and Goumas were only the first level in an elaborate structure established by Citicorp for reviewing loan requests of the magnitude that Bosman and Fotos were suggesting, *i.e.,* $20,000,000.00. As vice presidents in a regional office, it was Toriello and Goumas's job to develop a working proposal of the terms and conditions upon which a loan could be consummated by Citicorp. After conducting a preliminary investigation as to the financial requirements of the proposed loan facility, Toriello and Goumas, with the aid of others in their office, were to draft a standard proposal letter specifying a set of terms upon which Citicorp would consider lending money for the purchase of the assets. *See* Toriello Aff. at pp. 27–28. As is usually the case with a proposal letter, and as was the case here,

the terms of the proposal letter are a subject of negotiation between the borrower and the lender. *See Id.* at 28–34.

Once a proposal letter is drafted, it is submitted to the borrower and, if accepted, becomes a formal application for a loan. Again, as is usually the case, and as was the case here, the borrower is required to pay over a "good faith deposit" to Citicorp to "indicate [its] willingness to fulfill the pending arrangement". *See, e.g.,* Toriello Aff. at Exh. 1, p. 7. The deposit is then expended during a "due diligence" period in which Citicorp conducts an elaborate inquiry into the background of the transaction at hand. Toriello Dep. at pp. 34–35. It is refunded to the borrower (less administrative costs expended) if the loan is not approved. If at any time subsequent to the signing of the proposal the potential borrower decides not to proceed with Citicorp, the entire deposit is retained by Citicorp as a processing fee. *See* Toriello Aff. at Exh. 1, p. 7.

After the proposal letter has been accepted by the borrower, the regional vice presidents (in this case Toriello and Goumas) embark on the "due diligence" procedure. The goal of this effort is to produce an "initial credit memo" for submission to Citicorp headquarters in New York. *See* Toriello Dep. at p. 75. The initial credit memo constitutes a recommendation from the regional office as to whether the loan should be approved, and requires the signature of the two investigating vice presidents as well as the head of the regional office. *See* Deposition of Nicholas Goumas, sworn to November 27, 1989 (hereinafter "Goumas Dep.") at p. 21. The memo is then reviewed by two senior credit officers in New York, both of whom must approve the loan before a commitment to lend can be made. Finally, in certain cases, and in the case at bar, the loan must receive final approval of an officer at the Credit Policy Level within Citicorp. Toriello Dep. at p. 81; Goumas Dep. at p. 22.

---

**1.** Bosman and Fotos first dealt with Citicorp Industrial Credit, Inc. *See* Answer to Amended Complaint at ¶ 1. In November, 1987, Citicorp Industrial changed its name to Citicorp North America, Inc. *Id.*

## IIc. *The Negotiations*

When Bosman and Fotos met with Toriello and Goumas in February, 1987 to discuss the initial parameters of the proposed financing, they had very little information to supply to Citicorp. Specifically, they had no business plan regarding the proposed purchase of the assets. In addition, they informed Citicorp that they would be unable to supply any historic financial information regarding the mining operations inasmuch as the Casey–Kassas had made it clear that they would not release this information to facilitate the sale. *See* Certification of Steven Fotos, dated February 22, 1990 (hereinafter "Fotos Cert.") at 1; *see also* Deposition of Steven Fotos, sworn to July 31, 1989 (hereinafter "Fotos Dep.") at 27.

While Toriello and Goumas each testified that they informed Bosman and Fotos that Citicorp did not finance leveraged buyout transactions without verified, historic-financial data concerning the proposed acquisition, and that the inability to obtain this information would make the approval of the deal extremely difficult, it is Bosman and Fotos's recollection that no such statement was made; rather, Bosman and Fotos testified that they were told that the deal could proceed if Citicorp's own investigation provided the needed financial data. *See* Toriello Aff. at ¶ 4; *cf.* Fotos Cert. at ¶ 4. In any event, it is clear that the parties understood that Citicorp would require substantial information regarding the background of the proposed transaction before a commitment to lend could be made.

After approximately six weeks of preparatory work, Citicorp developed a preliminary proposal for a loan and prepared a draft proposal letter dated April 13, 1987. Some alterations were made to this document, and a formal letter indicating Citicorp's willingness to structure a possible loan was submitted to IMMCO on April 14, 1987. Bosman and Fotos reviewed the proposal "word for word" until they were satisfied with its contents. Fotos Dep. at 38. They signed the proposal letter on or about April 17. *See* Toriello Dep. at 29, 30; Fotos Dep. at 42.

The April 14th letter sets forth a set of proposed terms for the establishment of a loan facility. The letter explicitly states that it is merely a proposal for a loan and not a commitment to lend. The letter was informally addressed to Fotos, and began as follows:

Dear Steve:

It was a pleasure meeting with Abe Bosman and yourself over the past weeks regarding the acquisition of the assets of Silverbrook Anthracite/Kassa Coal Company. Based upon our examination of the information provided, Citicorp Industrial Credit, Inc. is pleased to make the following financial *proposal. It should be emphasized that the following is only a letter of proposal and is not intended nor should be construed to be a commitment on the part of Citicorp.* (emphasis added).

*See* Toriello Aff. at Exh. 1, p. 1.

None of the parties dispute that this letter was merely a proposal and not a commitment to lend, and indeed that no commitment to lend would arise until a specifically enumerated list of conditions precedent had been met. *See* Fotos Dep. at 42. More specifically, the letter provided that the commitment to fund depended upon the successful fulfillment of twenty-two conditions precedent, including, *inter alia,* the completion of Citicorp's credit investigation and the granting of final credit approval by Citicorp. *See* Toriello Aff. at Exh. 1, p. 6–7; *see also* IMMCO Movant Brief at 19.

After securing the letter of intent to proceed and IMMCO's good faith deposit of $20,000.00, Citicorp then entered into the "due diligence" phase of the arrangement. At the culmination of this process in mid-September, 1987, Citicorp produced an initial credit memo spanning thirty-seven single-spaced typed pages. *See* Toriello Aff. at Exh. 3. The memo provided an exhaustive review of the anthracite market in Northeastern Pennsylvania and of the specific transaction at hand, and recommended approval of the loan. The memo was endorsed by both Toriello and Goumas, as well as by the head of the Englewood Cliffs

office, Steven Fischer. Accordingly, it was sent to Citicorp headquarters in New York for review by two senior credit officers.[2]

When the proposal was reviewed in New York, Dennis Bermack ("Bermack"), a senior credit officer, refused to recommend approval of the loan. By memorandum dated October 2, 1987, Bermack stated that while he was impressed with the historic financial data which Citicorp had been able to assemble, he remained concerned that there was no validating, historic financial information from the owners of the mine themselves regarding production capacity. *See* Toriello Affidavit at Exh. 5. In light of this fact, and for other reasons, it was his belief that the large commitment Citicorp was being called upon to make in relationship to the small contribution that IMMCO was willing to make did not warrant approval of the transaction. *Id.* Bermack particularly stressed the downside risk of the transaction to Citicorp if the deal went sour. *Id.* Therefore, without proof of proven production capacity, Bermack would not approve the proposed loan facility.

After Bermack's reservations were communicated to the Englewood Cliffs office, Toriello and Goumas set about restructuring the loan to ensure that Citicorp would be able to recover its investment if the new enterprise failed. They determined that it would be critical for Citicorp to be able to liquidate above ground stocks of coal in the event that the new enterprise failed, inasmuch as they recognized that if the new enterprise failed because of its inability to mine sufficient amounts of underground coal, Citicorp would in all likelihood be itself unable to extract coal from the ground more successfully than the operators had, and would thus need existing above ground stocks on hand to serve as security for repayment. *See* Toriello Dep. at 105–106; Toriello Aff. at ¶ 15.

Prior to this time, it had been reported to Toriello and Goumas that the Silverbrook mine held large culm reserves,[3] worth approximately $20 million.[4] While the initial deal had contemplated the eventual processing of these reserves—IMMCO was to build a new culm breaker at the plant site—it now became a priority of Citicorp for purposes of securing the loan to be able to process this material immediately should it be needed. *See* Toriello Aff. at ¶ 15 and Exh. 5; Toriello Dep. at 109. Fotos suggested that Citicorp would be able to process the culm through one of three culm breaking plants in the area, one of which was known as Culmtech. *See* Fotos Cert. at ¶ 15; Goumas Dep. at 68.

Citicorp investigated the possibility of processing the culm at Culmtech, and in fact re-wrote the form for credit approval to require that any final commitment to lend not be issued until a signed lease was in existence with Culmtech. Thus the revised form for credit approval specifically provided:

> Funding will be subject to: ... (5) Lease agreement with Culm–Tech covering terms agreeable to CIC [Citicorp Industrial Credit].

*See* Toriello Aff. Exh. 7. Citicorp also revised the total figure for the lending facility by raising the proposed base amount from $20 to $21 million. *Id.* at ¶ 19.

After re-working the transaction in this manner, the loan was reviewed by two different senior credit officers in New York,

---

2. As is customary, attached to the memo was a summary of the transaction proposal known as the "form for credit approval". The form for credit approval is the only document in a proposed loan transaction which sets forth the full terms of the loan, and is subject to change until all of the approval signatures are attached. *See* Toriello Aff. at ¶ 13. The form sets forth a complete distillation and summary of the terms upon which the loan will be made. As is evident from the record, no final form for credit approval was ever executed by Citicorp.

3. "Culm" consists of refuse coal screenings made up of an admixture of coal, rocks and dirt. As the precision of coal processing techniques have improved over time, it has become possible to recapture the value of the coal initially discarded as refuse by reprocessing the culm.

4. Although it is not entirely clear from the record, it appears that Silverbrook did not in fact own the culm banks, but merely held an option to purchase them and, thus, could not process the culm itself. *See* Toriello Affidavit at ¶ 24; Faleski Dep. at p. 129–131.

Scott Miller and John Podkowsky. *See* Toriello Aff. at ¶ 20; Goumas Dep. at 67. As part of the review procedure, Miller and Podkowsky travelled to Pennsylvania on October 29, 1987 to view the Silverbrook enterprise. They were also taken on a tour of the Culmtech facility, and learned—for the first time—that the Culmtech was in bankruptcy. *See* Fotos Dep. at 303; *see also* Deposition of Scott Miller, sworn to February 20, 1990 (hereinafter "Miller Dep.") at 21. Shortly thereafter, Toriello and Goumas also learned that Culmtech was in bankruptcy.[5]

After learning of Culmtech's bankruptcy, Toriello and Goumas were forced yet again to review the matter. As evidenced by the revised form for credit approval, Toriello and Goumas had accepted the suggestion of utilizing Culmtech to process the culm in the event of default, and now faced the prospect of Culmtech itself being extinct in the event that Citicorp actually needed it to back-up the loan. Thus the proposed method of securing the loan was untenable, and both Toriello and Goumas knew that they would have to take another look before recommending to New York once again that the loan be approved.[6]

When the members of the Citicorp regional office reviewed the transaction in light of the new information concerning Culmtech, they ultimately determined that they could no longer recommend approval. Although they briefly attempted to restructure the final loan package by requiring that the individual IMMCO investors add more capital, *see* Toriello Aff. at ¶ 26, no such arrangement came to pass.

In the final analysis, the Citicorp officials reviewing all that had gone before would not approve the transaction both because they felt that they had been misled regarding the status of Culmtech, *see* Fischer Dep. at 30, and because they were not willing to recommend a transaction in which Citicorp put in $21 million and the principal investors put in only $200,000.00. *See* Toriello Aff. at ¶ 26. On December 8, 1987, Fischer formally advised IMMCO of Citicorp's decision. *See* Toriello Aff. at Exh. 8. In accordance with the terms of the proposal letter of April 14, Citicorp also refunded that portion of the $20,000.00 deposit which had not been expended. Although IMMCO subsequently tried to secure financing from other commercial lenders, it was unsuccessful.

## III. DISCUSSION

### IIIa. *Standard For Summary Judgment*

Summary judgment may be granted where the pleadings, depositions, affida-

---

**5.** It appears that Toriello and Goumas were advised of the Culmtech bankruptcy in a telephone conversation held on November 3, 1987, after they called the Culmtech facility to review processing figures with Culmtech's president, Fred Davis. *See* Toriello Aff. at ¶ 21; *see also* Toriello Dep. at 137. Goumas also recalls being advised of the bankruptcy in a telephone conversation he had with Miller and Podkowsky on or about October 30, 1987, when Miller and Podkowsky were discussing the trip they had just taken to view the Silverbrook operations. *See* Goumas Dep. at 71. In any event, it is clear that Citicorp discovered that Culmtech was in bankruptcy only after it had acted on Fotos's suggestion of processing the culm at Culmtech, and only after Miller and Podkowsky toured the facilities as part of the second review of the loan. At no time prior to the Miller and Podkowsky tour did any IMMCO official mention to Citicorp that Culmtech was in bankruptcy. The significance of this omission is addressed within.

**6.** At the same time that Toriello and Goumas learned of Culmtech's bankruptcy, they also learned that Faleski may have maintained a more involved relationship with Culmtech than they had previously understood. When Toriello and Goumas telephoned Culmtech on November 3, 1987 with an eye to going over extraction figures with Culmtech's president, Fred Davis, they were actually put in touch with Faleski, who was apparently supervising some of the operations at the plant. *See* Toriello Aff. at ¶ 21; *see also* Toriello Dep. at ¶¶ 133–134; Goumas Dep. at 70–71. While the parties disagree as to the degree of Faleski's role and allegiance to Culmtech, *see* IMMCO Opposition Brief at 9, n. 3, certain facts concerning the relationship are undisputed. In addition to leasing equipment to Culmtech—a fact which Citicorp knew—Faleski also managed the operation of the vehicles at the Culmtech site—a fact which Citicorp apparently did not know. *See* Certification of Fred Davis, dated February 22, 1990 (hereinafter "Davis Cert.") at ¶ 3. It thus appeared to Citicorp that an IMMCO principal was also involved in the day to day operations at Culmtech. The significance of this relationship and Citicorp's reaction to it will be addressed within.

vits, and other elements of the record show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). *See Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3rd Cir.1986); *see also Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3rd Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The purpose of the motion is to eliminate a trial in cases where it is unnecessary and would only cause delay and expense. *Goodman,* 534 F.2d at 573.

A motion for summary judgment must be granted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial", *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Indeed, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts", *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Thus the entry of summary judgment is appropriate and required unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party", *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the evidence is merely colorable or not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–250, 106 S.Ct. at 2510–2511; *see also Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3rd Cir. 1987).

IIIb. *IMMCO's Claim Alleging Breach of Contract: Count I*

■ There can be little doubt that the letter of April 14th did not constitute a binding contract to fund the purchase of the assets. The language of the letter itself clearly stated, as noted above, that it was "not intended nor should be construed

to be a commitment", and that any commitment to lend would be dependent upon the fulfillment of a large number of conditions precedent. This language clearly evidences a lack of intent on Citicorp's part to be bound by any commitment until it could reach a confidence level at which it felt able to fund the purchase, that is, until Citicorp had successfully completed its credit evaluation. It is axiomatic that no contract exists in the absence of a mutual intent to be bound. On this point, there is no disagreement between the parties.

The more subtle question about which the parties do disagree, however, is whether or not Citicorp reasonably or unreasonably denied final approval and, indeed, whether Citicorp's decision is even reviewable by this Court. Citicorp's answer to this question is that no contract could exist between the parties by virtue of the fact that final credit approval was never given by Citicorp, an admitted condition precedent to funding the loan, and thus that its decision to deny the loan was eminently reasonable. IMMCO responds that Citicorp was bound by the covenant of good faith and fair dealing implicit in any contract entered into within this state not to act in such a manner as to deprive the other party of the benefit of its bargain. *See* IMMCO Opposition Brief at 12, 19. Once IMMCO met all of the conditions precedent set forth in the letter, which it claims it did but, of course, it did not, Citicorp was obligated to commit to the loan and its failure to do so was unreasonable. *See* IMMCO Opposition Brief at 17–21.

Central to the determination of this lawsuit, then, is the legal significance of the conditions precedent contained in the April 14 letter. The Court must decide as a matter of law *first* whether Citicorp's failure to approve the loan is subject to a test of good faith and fair dealing and, *second,* if it is determined that such a decision must be made in good faith, whether or not, on the facts presented, Citicorp's decision to deny the loan was reasonable, thus making

summary judgment in its favor appropriate.

### IIIb(i). *The Parties' Responsibilities Under The Proposal Agreement:*

■ While I agree with Citicorp that a bank is under no duty to issue a commitment every time a loan application is proffered, it is clear that the proposal letter here constituted more than a unilateral request to fund a loan or to do business with a certain company. The letter clearly constituted an integrated agreement to bargain in good faith over the possibility of funding the assets. In exchange for the $20,000.00 commitment, Citicorp agreed to investigate the possibility of funding IMMCO's proposed acquisition of the mine. IMMCO agreed to supply information and data to Citicorp, and Citicorp agreed to review this material with reasonable care. Certainly both parties held mutually optimistic expectations of making substantial profits if the purchase was funded along the parameters set forth in the letter. In addition, once both parties had placed their signatures on the letter, Citicorp held the power to hold the deposit forfeit if IMMCO decided to go elsewhere. Certainly no one has suggested that Citicorp would have been able to spend the $20,000.00 deposit in an irresponsible or profligate manner and then deny IMMCO's loan request. I am thus in agreement with IMMCO that Citicorp was bound to exercise its "satisfaction" obligations set forth as conditions precedent to lending in a responsible manner.[7]

It must be stressed, however, that a proposal to agree in good faith to consider a loan is not tantamount to an agreement to lend money. Citicorp agreed to consider the proposed transaction and fund the acquisition if, and only if, the conditions precedent in the proposal letter were fulfilled. The conditions explicitly stated that funding was subject to the successful completion of several internal review procedures at Citicorp, not the least of which was the successful review of the money making potential of the assets and the creditworthiness of the deal. As long as Citicorp made this decision in a reasonable manner, no liability can attach for the decision not to fund.

### IIIb(ii). *The Nature of Citicorp's Actions:*

■ There can be no doubt that Citicorp fulfilled its duties under the agreement to reasonably investigate the proposed transaction. IMMCO has failed to present a shred of evidence tending to indicate that the excruciatingly detailed information package assembled by Citicorp was anything short of a Herculean effort to facilitate the transaction. Indeed, even after the initial proposal did not receive approval from New York, the Citicorp regional office attempted to restructure the transaction to alleviate the concerns of senior credit management. In short, there is no evidence from which a jury could reasonably conclude that Citicorp breached its agree-

7. Under New Jersey Law, "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing' ", *see Association Group Life, Inc. v. Catholic War Veterans of the United States,* 61 N.J. 150, 153, 293 A.2d 382 (1972) (citations omitted). *See also Onderdonk v. Presbyterian Homes,* 85 N.J. 171, 182, 425 A.2d 1057 (1981); *Bak–A–Lum v. Alcoa Building Products,* 69 N.J. 123, 129–130, 351 A.2d 349 (1976). Where the performance of a contract depends upon the satisfaction by one party with the commercial performance of another, the party holding the power to determine whether or not performance is satisfactory must exercise that judgment in good faith. *See Fitzmaurice v. Van Vlaaderen Mach. Co.,* 110 N.J.

Super. 159, 161–162, 264 A.2d 740 (App.Div. 1970) (exercise of satisfaction/termination clause in employment contract as to worker's profitability subject to test of honesty and good faith); *see also Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637, 651–652 (D.N.J. 1980) (termination of beer distributorship subject to implied covenant of good faith and fair dealing inherent in all contracts).

The cases cited by Citicorp in its brief are not to the contrary. Thus while Citicorp cites cases from Florida, Colorado, Indiana and Georgia for the proposition that the covenant of good faith and fair dealing cannot be used to alter the express terms of an agreement, *see* Citicorp Movant Brief at 37–38, IMMCO has not argued that the terms of the agreement should be altered, but rather that the terms of the agreement must be construed and acted upon in good faith. There is nothing novel in this assertion.

ment to properly investigate the proposed transaction. Accordingly, summary judgment will be entered in Citicorp's favor on Count I [8].

Parenthetically, I note that to the extent there is any evidence of a failure to fulfill the obligations created under the proposal letter, that evidence points to IMMCO. It is uncontroverted that it was IMMCO which suggested Culmtech as a possible solution to the problem of securing a facility to process the culm, and it is uncontroverted that it was IMMCO which failed to mention until the on-site review of the facility that Culmtech was in bankruptcy. While IMMCO strenuously objects to the assertion that it attempted to materially mislead Citicorp in this regard—an objection with which I am compelled to agree on this motion for summary judgment—it cannot be said that it was commercially unreasonable for Citicorp to have regarded the omission of this fact—intended or otherwise—as a genuine problem, if for no other reason than that its omission occasioned Citicorp to lose faith in the business acumen and, perhaps, the forthrightness of the principals of IMMCO.[9]

### IIIc. IMMCO's Claims Alleging Tortious Breach of Contract: Counts III and IV

IMMCO has alleged several causes of action sounding in tort which relate to the basic breach of contract action pled in Count I. Thus, in addition to alleging that Citicorp's failure to fund the project constitutes a breach of the proposal agreement, IMMCO also alleges that Citicorp is liable for punitive damages stemming from the "malicious, and/or intentional, and/or negligent, and/or grossly negligent" breach of the agreement to finance. See Amended Complaint, Count III. Further, in Count IV, IMMCO has re-pled the breach of the covenant of good faith and fair dealing implicit in the cause of action alleged in Count I, and added a claim for breach of fiduciary relationship. See Amended Complaint, Count IV.

Having already found that Citicorp did not breach its contract with IMMCO, and indeed that no material dispute of fact exists concerning the reasonableness of Citicorp's behavior, it follows ineluctably that no cause of action will lie for the negligent or reckless performance of the contract. Moreover, it is clear as a matter of law that, even were I incorrect in my finding

---

**8.** While IMMCO has stressed that it is only within the province of the jury to make a determination as to the commercial reasonableness of Citicorp's behavior, this is so only where a material dispute of fact exists regarding the reasonableness of Citicorp's behavior. On the facts of this case, no room for doubt exists as to the reasonableness of Citicorp's actions, and judgment is appropriate as a matter of law. See, e.g., Rigby Corp. v. Boatmen's Bank and Trust Co., 713 S.W.2d 517, 527 (Mo.App.1986) (where record shows by unassailable proof that bank did not lack honesty in fact and that there remained no genuine issue of fact as to the good faith of the bank throughout the transaction, summary judgment is appropriate); see also Markowitz v. Republic Nat. Bank of New York, 651 F.2d 825, 828 (2nd Cir.1981) ("A plaintiff does not become entitled to a jury trial simply by asserting a cause of action in which the defendant's state of mind is a material element"; summary judgment properly granted in favor of defendant bank accused of bad faith refusal to release lien held on lots). It is axiomatic, of course, that the grant of summary judgment does not impinge upon the right to a jury trial, inasmuch as the Court has had no recourse to decide issues of disputed fact when considering the motion. The province of the jury is never invaded.

**9.** I note in passing that IMMCO has repeatedly stressed that it suggested the use of Culmtech only as one of three possible options for processing the culm, and that it had no idea that Citicorp was actually relying on this suggestion in solving the processing problem. IMMCO claims that it had no particular knowledge that Citicorp had revised its internal form for credit approval to specifically require a lease with Culmtech before approving the loan. IMMCO therefore claims that it was unreasonable for Citicorp to deny the loan based in part upon its disenchantment with the failure to disclose the bankrupt status of Culmtech, a fact which IMMCO asserts it would have disclosed had it known of the importance of the Culmtech operation to Citicorp. See Fotos Cert. at ¶¶ 15–17, 19. This assertion, even were it true, hardly raises an inference of bad faith on the part of Citicorp and, indeed, borders upon the absurd. Under no standard of reasonableness could Citicorp be said to have been obligated to second guess what IMMCO as borrower might have told them about Culmtech had IMMCO known that Citicorp would "actually rely" on this proposed solution to the problem of securing the loan.

that there is no material dispute of fact as to the reasonableness of Citicorp's behavior, no cause of action sounding in tort would exist independent of the contractual remedies IMMCO might then possess.

It has long been the law that remedies in tort relating to a breach of contract may not be maintained in addition to those established under the contract itself in the absence of any independent duty owed by the breaching party to the plaintiff. Thus, IMMCO may not recover from Citicorp under a tort theory alleging "malicious" or "negligent" breach of the April 14th letter, inasmuch as no independent fiduciary duty is generally owed from a lender to a borrower, *see, e.g., Washington Steel Corp. v. TW Corp.,* 602 F.2d 594, 599–600 (3rd Cir. 1979), and IMMCO has only alleged economic losses stemming from the failure to approve the loan upon the satisfaction of the conditions precedent in the letter.

Where a party does not owe another a duty of care absent the existence of a contract, a separate duty of care cannot arise simply by virtue of the existence of the contract. Indeed, it is fundamental that a party's liability for breach should be governed strictly by the application of foreseeable damages stemming from the establishment of the contractual relationship. To hold otherwise would chill business relations through the application of unforeseen damages upon one who may elect to effectively breach an agreement. It has, thus, consistently been held that an independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself. *See,*

*e.g., Feldman v. U.S. Sprint Communications Co.,* 714 F.Supp. 727, 733 (D.N.J. 1988) (motion for summary judgment granted on claim of gross negligence in action for failure to supply sales commissions pursuant to contractual arrangement where plaintiff is owed no duty other than that arising out of contract); *see also New Mea Const. Corp. v. Harper,* 203 N.J.Super. 486, 494, 497 A.2d 534 (App.Div.1985); *Coyle v. Englander's,* 199 N.J.Super. 212, 226, 488 A.2d 1083 (App.Div.1985); Prosser & Keeton, *The Law of Torts,* 655–657 (5th ed.1984).

Accordingly, IMMCO's claims for the tortious breach of contract alleged in Count III, as well as that portion of Count IV purporting to set forth a separate cause of action for breach of fiduciary duty, will be dismissed.

IIId. *IMMCO's Claims Alleging Fraud and Misrepresentation: Counts II and VI*

■ Counts II and VI of the Amended Complaint purport to set forth claims relating to Citicorp's alleged fraud and misrepresentation in handling the loan application. More specifically, Count II seeks punitive damages against Citicorp for stating that the loan conditions had been met and that financing would be forthcoming, when in fact Citicorp ultimately determined that the conditions had not been met and financing would not be forthcoming. *See* Amended Complaint, Count II. Similarly, Count VI states that Citicorp violated the provisions of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 *et seq.,* (the "Act") when it denied IMMCO's request for a loan.[10] On

10. While IMMCO has not identified any specific provision of the Consumer Fraud Act as a source for its claims against Citicorp, it is apparent that the only provision of the Act which would encompass the behavior currently under review is N.J.S.A. 56:8–2, which provides, in pertinent part, that:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subse-

quent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.
*See* N.J.S.A. 56:8–2.

As a preliminary matter, I note that Citicorp challenges the applicability of the Act to a situation which it describes as being governed by the Uniform Commercial Code. *See* Citicorp Movant Brief at 43–44. Citicorp contends that the Consumer Fraud Act is generally inapplicable in those situations where a detailed body of law already exists to regulate a particular industry or trade, a proposition with which I agree. *See, e.g., Daaleman v. Elizabethtown Gas Company,* 77 N.J. 267, 390 A.2d 566 (1978) (consumers possess no cause of action against gas company

the facts presented, however, recovery will not lie for fraud either under a common law theory or under the Consumer Fraud Act.

As to IMMCO's allegations of fraud set out in Count II, New Jersey law requires that a plaintiff demonstrate that there has been "a material [mis]representation of a presently existing fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624–625, 432 A.2d 521 (1981). *See also Nappe v. Anschelewitz, Barr, Ansell,* 189 N.J.Super. 347, 354, 460 A.2d 161 (App.Div.1983). Most importantly, the purported reliance must have been reasonable under the circumstances or no ground for recovery will exist. As the court in *Nappe* specifically noted:

> Reliance by plaintiff is another necessary element of a cause of action for fraud. According to general decisional law, that reliance must have been justifiable, for example, when facts to the contrary were not obvious or did not provide a warning making it patently unreasonable that plaintiff not pursue further investigation. . . .

*Nappe,* 189 N.J.Super. at 355, 460 A.2d 161. *See also* Restatement of Torts (Second) § 537 (1977) (accord).

IMMCO has only alleged that members of the Englewood Cliffs office or other senior credit officers represented to them their understanding that the loan would be acceptable to higher management at Citicorp, that is, their belief or hope that the deal would be funded. *See* Faleski Dep. at 106–107; Fotos Dep. at 75, 145–146. But reliance on any such statements would certainly not hve been reasonable under the

circumstances, particularly when all of the principals at IMMCO understood that no commitment to lend would be forthcoming without the issuance of a commitment letter from Citicorp. *See, e.g.,* Fotos Dep. at 42. Because the law does not permit recovery for fraud or misrepresentation based upon reliance which is unreasonable, summary judgment must be granted in Citicorp's favor on this count as well.

In this regard, this case is remarkably similar to *Kruse v. Bank of America,* 202 Cal.App.3d 38, 248 Cal.Rptr. 217 (1 Dist. 1988), *cert. den.,* —— U.S. ——, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989), in which the California Court of Appeal reversed a jury verdict against a lending institution where the plaintiff had alleged both fraud and the bad faith denial of a commitment to make a long term loan. More specifically, the plaintiff in *Kruse* had alleged that the conduct and statements of the bank's regional officer constituted indicia of a commitment to lend upon which plaintiff had relied to his detriment. The Court of Appeal rejected these assertions as being completely unsupported by the evidence presented when, in point of fact, plaintiff knew that the head of the bank's regional office had no authority to independently approve a loan. As the California court noted—in reasoning which is directly supported by the concept of justifiable reliance set forth in *Nappe*—plaintiff's knowledge that the loan required approval must also have entailed an understanding that the loan could be denied, thus negating any possibility of reasonable reliance. *See Kruse,* 202 Cal. App.3d at 55, 248 Cal.Rptr. at 226.

In reversing the jury's verdict, the California court summarized its reasoning as follows:

under the Consumer Fraud Act where consumers seek to challenge a tariff regulated by Public Utility Commission) (*Daaleman* noted in Citicorp Movant Brief at 44). However, I can discern no provision of the Uniform Commercial Code which would govern the transaction at hand, and therefore find the cases Citicorp relies on for dismissal on these grounds to be inapposite. The Act, of course, covers the sale of services as well as goods, *see* N.J.S.A. 56:8–1(c), and has been construed to cover transac-

tions in which business entities and not merely ordinary consumers claim to have been defrauded. *See Hundred East Credit Corp. v. Eric Schuster Corp.,* 212 N.J.Super. 350, 356, 515 A.2d 246 (App.Div.1986). In fact, the Act has been held applicable to allegations of fraud between a sophisticated principal and a loan broker. *See John Alden Life Insurance Co. v. Feldman,* —— WL ——, 1988 U.S.Dist. LEXIS 13625. Accordingly, I see no basis for dismissal on this ground.

At most Sullivan [bank officer with whom plaintiff dealt] expressed an interest in securing the desired financing. As previously discussed, he and George M. Jewell [plaintiff] engaged in ongoing discussions and negotiations for the purpose of obtaining the necessary loan approval from Sullivan's superiors, a prospect long incubating within George M. Jewell's hopeful expectation, an optimism he quickly shared with [others]. Yet, George M. Jewell's optimism was unfounded. He knew that Sullivan lacked authority to approve the sizable loan necessary to fund the dehydration plant. The very premise of their frequent discussions was the need to obtain the approval of the regional office.... It is indisputable that the regional office's approval was recognized by ... Jewell[ ] ... as a condition precedent to the Bank's expected commitment to extend long-term financing. The evidence of such contingent expectations and negotiations is far removed from a binding promise to lend money and also negates any reasonable reliance upon the Bank's alleged misrepresentations.

*Kruse,* 202 Cal.App.3d at 64, 248 Cal.Rptr. at 232–233. The reasoning in *Kruse* is compelling. However disheartening it may be to IMMCO and its principals, the law does not supply a cause of action for fraud on the basis of misplaced optimism. For the foregoing reasons, IMMCO's claims alleging fraud and misrepresentation as set forth in Count II shall be dismissed.

Largely for the reasons noted above, IMMCO's claims arising under the Consumer Fraud Act as set forth in Count VI will also be dismissed. As is true regarding IMMCO's allegations of common law fraud, IMMCO's allegations regarding a breach of

the Consumer Fraud Act are completely unsupported by the facts presented. The complete failure of proof in this regard warrants dismissal. *See Celotex,* 477 U.S. at 322–323, 106 S.Ct. at 2552–2553.

IIIe. *Equitable and Promissory Estoppel*

Count V sets forth a cause of action based upon equitable and promissory estoppel[11]. As a matter of law, there is utterly no basis for the application of either equitable or promissory estoppel, and summary judgment shall be granted in Citicorp's favor on this count as well.

■ Equitable estoppel is a principle designed to prevent unfairness, and is enforceable at law or in equity. *See Mattia v. Northern Ins. Co. of New York,* 35 N.J.Super. 503, 510, 114 A.2d 582 (App.Div. 1955). The doctrine provides that one may not "repudiate an act done or position assumed where that course would work injustice to another who, having a right to do so, has relied thereon". *Id. (quoting New Jersey Suburban Water Co. v. Town of Harrison,* 122 N.J.L. 189, 194, 3 A.2d 623 (E. & A. 1934).

The elements of equitable estoppel require that there have been "conduct amounting to a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel ...". *Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 N.J. 334, 339, 403 A.2d 880 (1979). The conduct must be done "with the intention or expectation that it will be acted upon by the other party", in such a way that the latter is induced to changing his or her position for the worse. *Id.*

---

**11.** More specifically, Count V of the Amended Complaint alleges in pertinent part:

2. Given the contract of April 14, 1987 ... and the various promises and assurances by agents, representatives or employees of the defendants to the plaintiff, the defendants are liable to the plaintiff pursuant to the doctrine of promissory estoppel and/or equitable estoppel.

3. As a result of the various and sundry promises made by the defendants inducing reliance on the part of the plaintiff, the plaintiff continued to work toward the funding of the project until November, 1987 when the project was terminated by the defendants. The plaintiffs [sic] relied in good faith upon the various representations made by the defendants to their detriment. As a result of the actions of the defendants, the plaintiff was not able to secure the appropriate funding for this project and thus could not consummate a contract for the purchase of various properties and the assets.

*See* Amended Complaint, Count V.

As with IMMCO's allegations of fraud, it cannot be said that the facts support a misrepresentation on the part of Citicorp. At most IMMCO has described a situation of misplaced optimism, and not of active misrepresentation. While IMMCO also asserts in general that it was improper for Citicorp to reject the loan based in part on the absence of "historic financials" when Citicorp knew "from the beginning" that no historic financials would be supplied, *see* IMMCO Opposition Brief at 3, this argument, too, must fail. Even by Fotos's own testimony, Citicorp did not say it would fund the transaction despite the absence of historic financial information; Citicorp said it would consider financing the transaction without the usual information if its own credit investigation proved satisfactory. *See* Fotos Cert. at ¶ 4. The fact that Citicorp could not ultimately overcome the absence of historic financial information does not mean that Citicorp misrepresented the possibility of financing the loan in the absence of such information.

■ While promissory estoppel, like equitable estoppel, has as its goal the avoidance of unfairness based upon justified reliance, the application of promissory estoppel turns not upon the misrepresentation of a fact but rather the absence of consideration. *See* Farnsworth, *Contracts* § 2.19 (1982). Promissory estoppel thus precludes the promisor from raising a defense of lack of consideration where it would be inequitable to allow the defense in the face of the plaintiff's reliance. *Id.*

Promissory estoppel simply does not apply to the facts as they exist. Again, the April 14 letter was not a contract to finance, but merely an agreement to consider financing. This agreement was supported by consideration, *i.e.*, IMMCO's $20,000.00 deposit. IMMCO received the benefit of its bargain when Citicorp undertook its exhaustive investigation. Summary judgment is therefore appropriate on this aspect of Count V as well.

---

**12.** Citicorp has also objected to Count VII on the ground that a corporation is incapable of asserting a cause of action for the tort of outrage, *see*

### IIIf. *IMMCO's Claims Alleging Outrageous and Wanton Conduct: Counts VII and VIII*

■ The remaining allegations in IMMCO's complaint do not merit prolonged discussion. IMMCO's assertions that Citicorp's behavior was "outrageous and not tolerated in a civilized community", *see* Amended Complaint, Count VII, as well as IMMCO's assertion that Citicorp's actions were "wilful, wanton, gross and intentional", *see* Amended Complaint, Count VIII, are completely without foundation in the record. Even were I incorrect in my finding as to the absence of any factual dispute regarding the reasonableness of Citicorp's behavior with regard to the breach of contract, there can be no doubt that the record is simply devoid of any indication that Citicorp's behavior was somehow "outrageous" or "wanton". These frivolous claims will be dismissed without hesitation.[12]

### IIIg. *Sanctions and Costs*

■ In Count IX of its Amended Complaint, IMMCO seeks its costs of litigating this action. This request will be denied. IMMCO has been wholly unsuccessful in its claims and, even had its complaint been warranted on the facts, the American Rule provides that each side shall bear its own costs. *See, e.g., Alyeska Pipeline Service Company v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *Ford v. Temple Hosp.,* 790 F.2d 342, 346–347 (3rd Cir.1986).

Citicorp's motion for sanctions pursuant to Federal Rule of Civil Procedure 11 will also be denied. Rule 11 was never intended to punish counsel "whose only sin was being on the unsuccessful side of a ruling or judgment". *See Gairdo v. Ethyl Corp.,* 835 F.2d 479, 483 (3rd Cir.1987). Indeed, the rule is intended as a deterrent only in those circumstances which evidence a clear abuse of the judicial process, an abuse which has not been displayed here. *See,*

---

Citicorp Movant Brief at 45, an issue I need not reach.

*e.g., Hussain v. Carteret Sav. Bank, F.A.,* 704 F.Supp. 567, 569 (D.N.J.1989).

## IV. CONCLUSION

For the foregoing reasons, Citicorp's motion for summary judgment shall be granted in its entirety. Citicorp's motion for sanctions shall be denied. An appropriate order shall issue.