Jeffery G. McWATERS,
Plaintiff–Appellant,

v.

Thomas Lee PARKER and Creasy
Trucking, Inc., Defendants–
Appellees.

No. 92–2082.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1993.

Decided May 20, 1993.

As Amended on Denial of Rehearing
July 6, 1993.

Robert P. Kennedy, Tammy S. Sestak (argued), Spangler, Jennings & Dougherty, Merrillville, IN, George R. Livarchik, Livarchik & Farahmand, Chesteron, IN, for plaintiff-appellant.

John M. McCrum, Eichhorn, Eichhorn & Link, Hammond, IN, Jon M. Pinnick (argued), Frederick H. Link, Eichhorn, Eichhorn & Link, Merrillville, IN, for defendants-appellees.

Before COFFEY and KANNE, Circuit Judges, and HOLDERMAN, District Judge.*

KANNE, Circuit Judge.

On March 6, 1991, Jeffery McWaters filed a complaint against the defendants to recover damages for injuries he sustained in a car accident. On April 8, 1992, the district court granted the defendants' motion for summary judgment, concluding that a release agreement executed by Jeffery barred his personal injury suit. For the following reasons, we affirm.

## I. Facts

In the early hours of February 1, 1990, in Gary, Indiana, twenty-three year old Jeffery McWaters' vehicle collided with a truck driven by the defendant, Thomas Lee Parker. Shortly afterward, an ambulance took Jeffery to St. Mary's Medical Center's emergency room where he received treatment for a bleeding forehead and right shoulder bruises and abrasions. Jeffery's head and chest were x-rayed and he received twelve stitches for his head wound. He was released from the emergency room on the day of the accident and was able to return to work the next day. Jeffery's total medical expenses from the emergency room treatment were $371.25.

Following the accident, Parker, a Tennessee citizen, called his employer, Creasy Trucking, Inc. ("Creasy"), a Tennessee concern, and informed it of the accident. Creasy told Parker to call the company's insurance carrier, Carolina Casualty Insurance Company ("Carolina"), which Parker did. Carolina contacted Ray D. Denton & Associates ("Denton"), an independent adjusting company, to investigate the accident on behalf of Creasy and Parker. Denton gave the assignment to its employee Ray Turner.

Turner went to the collision site on the morning of the accident and took photographs. Next, Turner went to the hospital to check on Jeffery's condition. The emergency room nurse told Turner only that Jeffery had been x-rayed, treated and released; she did not disclose the type or extent of his injuries. Subsequently, Turner obtained Jeffery's full name and address from the police station. That same afternoon, before he had met Jeffery, Turner faxed a report to Carolina from which it established reserves for the accident.[1] That evening, Turner went to Jeffery's residence in Gary; because Jeffery was not home Turner left a business card with a request that Jeffery call him. Over the next few days, Turner did not hear from Jeffery and subsequent visits to his residence proved fruitless.

On February 7, Jeffery's employer's doctor removed his stitches and told him that the cut appeared healed. On February 9, Turner returned a call from Caston McWaters, Jeffery's father. Turner requested a meeting with Jeffery to obtain his statement regarding the accident. Caston replied that he would not allow Jeffery to meet with Turner until he had cleared it with his own insurance company. Apparently Caston obtained approval, and on February 14, Turner met with Jeffery and both his parents at Jeffery's mother's house. During that meeting, Turner questioned Jeffery both about the accident and his injuries. Turner noted that Jeffery did not appear to be injured other than the scar on his forehead. Turner also obtained a medical authorization from Jeffery, although he never used it to acquire further medical information. Turner did not make a settlement offer at this meeting.

The parties met again on March 5. Turner offered Jeffery $1,500 to settle the matter. Caston McWaters told Turner that $1,500 was not enough. Caston maintained that they needed at least $2,500 to settle:

---

* The Honorable James F. Holderman, District Judge for the Northern District of Illinois, is sitting by designation.

1. Turner faxed the following information to Carolina for the purpose of establishing reserves:
INJURIES
Jeff McWaters sustained a severe laceration to his head. Our adjuster advises that there was

considerable blood in the front seat of the car. The claimant was taken from the accident scene to St. Mary's Medical Center, 540 Tyler, Gary, Indiana. After being treated and x-rayed, however, the claimant was released.
The claimant, we should mention, after being released from the hospital, the claimant went to the tow yard to look at his car.

$500 for Jeffery's medical bills and $2,000 to replace the family car that had been totalled in the accident. According to the McWaters family, no payment for personal injuries was discussed. Turner informed the family that he did not have authority to settle for $2,500 and would have to call them back.

On March 6, Turner called Caston McWaters and told him that Carolina would pay $2,500 for "total settlement." That evening, Turner met with the McWaters family again. He brought with him two checks: one for $500 made out to Mr. and Mrs. McWaters, and one for $2,000 made out to Jeffery. Upon receipt of his check, Jeffery signed a release document; his parents did the same for their check. Each signed form was entitled "Release of all Claims." The form's text covered half of a page; capital letters stated "THE UNDERSIGNED HAS READ THE FOREGOING AND FULLY UNDERSTANDS IT," and over the signature block was the statement, "CAUTION: READ BEFORE SIGNING BELOW."[2] According to Mr. and Mrs. McWaters, Turner told them the document was merely a receipt for the check, and relying on Turner's statement they did not read the form or realize that they were signing a release. Caston McWaters maintains that Turner told Jeffery that he had to sign the paper to "buy peace"; however, Jeffery has no recollection of signing his form or the events surrounding the signing.

On April 30, 1990, Jeffery had the first of what were to become frequent and ongoing seizures. In June 1990, Jeffery's neurologist advised him that the only probable cause of his seizure activity was the head injury he sustained in the February car wreck. In October 1990, Jeffery lost his job at United States Steel due to his lengthy absence from work. As of December 1991, Jeffery had incurred over $76,000 of medical bills for treatment of his intractable seizures. On June 15, 1990, Jeffery "rescinded" his release, and on December 23, 1991, he returned $2,500 plus interest to Carolina.

As mentioned, Jeffery subsequently brought suit against Parker and Creasy; summary judgment was granted for the defendants. On appeal, as below, Jeffery advances four theories under which his suit should not be barred by the release document he signed in March 1990. Jeffery argues that the release is invalid because: (1) Turner and Jeffery made a mutual mistake as to Jeffery's medical condition; (2) the release was executed as a result of constructive fraud; (3) there was no meeting of the minds; and (4) the release was not supported by consideration in the form of a bargained-for exchange. Finding Jeffery's arguments unpersuasive, we affirm the district court's grant of summary judgment.

## II. Standard of Review and Applicable Law

We review a grant of summary judgment *de novo. Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762, 765 (7th Cir.1993). We will uphold the district court's ruling only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* In reviewing the record, all reasonable inferences from the evidence are drawn in favor of the nonmoving party. *Matsushita Elec-*

2. The release reads, in pertinent part:

[T]he undersigned, being of lawful age ... does hereby and for my heirs, executors, administrators, successors and assigns release, acquit and forever discharge Creasy Trucking Company and Thomas Parker, Their Driver ... of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has ... or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and property damage and the consequences resulting or to result from the accident ... which occurred on or about the 1st day of February 1990, at or near 2nd & Tennessee St., Gary, Indiana.

\* \* \* \* \* \*

The undersigned hereby declare(s) and represent(s) that the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite and in making this Release it is understood and agreed, that the undersigned rely(ies) wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefor and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.

*tric Ind. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). We also note, as a preliminary matter, that Indiana law governs the substance of this dispute because our jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1407 (7th Cir.1991).

## III. Mutual Mistake

According to Jeffery, summary judgment for the defendants is inappropriate in this case because a genuine issue of material fact exists as to whether the parties made a mutual mistake concerning Jeffery's condition which permits Jeffery to rescind his release. For the following reasons, we conclude that this is not a case of mutual mistake, and therefore Jeffery is not entitled to rescind his release under this theory.[3]

 A valid release bars a claimant from bringing a subsequent cause of action on the claim he released. *Lechner v. Reutepohler,* 545 N.E.2d 1144, 1147 (Ind.App. 1st Dist.1989). However, Indiana law does permit the recision of a release that is executed as a result of a mutual mistake as to a material fact. *Indiana Bell Telephone Co., Inc. v. Mygrant,* 471 N.E.2d 660, 663 (Ind. 1984). Both parties agree that the extent of Jeffery's injuries is a material fact in this case; the dispute is whether the mistake was mutual or simply unilateral. To settle this issue an examination of relevant Indiana case law is required.

In *Mygrant,* the plaintiff, Mr. Mygrant, was involved in a car accident in January 1980; at the time he did not believe that he had sustained any personal injuries. 471 N.E.2d at 661. In February 1980, he executed a release of all claims arising from the accident, including known and unknown bodily and personal injuries. *Id.* In April 1980, the plaintiff became aware of injuries traceable to the accident and notified Indiana Bell,

which claimed freedom from liability pursuant to the release. Mygrant argued that he was entitled to rescind due to a mutual mistake of fact—both he and Indiana Bell's representative were unaware that he had suffered any injury when they executed the release. *Id.* The Indiana Supreme Court did not agree.

The court held that the traditional unilateral versus mutual mistake analysis applied in release cases, given "the important policy of upholding releases in order to facilitate the orderly settlement of disputes." *Id.* at 664. Concluding that any mistake was not mutual but solely Mygrant's, the court noted that there was no evidence that the Indiana Bell representative had any belief about Mygrant's injuries, and that he clearly did not have independent knowledge concerning the extent of the plaintiff's injuries because all the adjuster's information about Mygrant's injuries came from Mygrant. *Id.* Further the court stressed that the release by its terms applied to unknown injuries. *Id.*

Jeffery acknowledges the law of *Mygrant* but claims his case is distinguishable. He argues that Turner had a belief about Jeffery's injuries—that they were slight—and that Turner acquired independent knowledge to form this opinion when he talked to the emergency room nurse the day of the accident. Therefore, Jeffery reasons that his case is closer to *Crane Co. v. Newman,* 111 Ind.App. 273, 37 N.E.2d 732 (1941), than to *Mygrant.*

 We are not persuaded. In *Crane,* the court concluded that a mutual mistake existed because "both parties had been misinformed as to the extent of the plaintiff's injuries by a doctor chosen by the defendant." *Mygrant,* 471 N.E.2d at 664. In the instant case, although Turner obtained authorization to review Jeffery's medical records, he never did; nor did he rely on an opinion of a doctor hired by Carolina. Rather, Turner only received information concerning Jeffery's medical condition from Jef-

---

3. Only Jeffery's release is at issue in this case. However, because Jeffery does not remember signing his release and because his father played such a large role in the negotiations that pro-

duced the release, we examine the evidence regarding the signing of all releases and treat Jeffery and his parents as if they signed one release.

fery. The emergency room nurse would not even disclose Jeffery's full name much less detailed medical information to Turner. All the nurse told Turner was that Jeffery had been released after being x-rayed and treated. We do not believe that this· meager amount of information is sufficient to satisfy the independent knowledge requirement developed by the Indiana courts.

To avoid this conclusion, Jeffery makes two arguments. First, he notes that in the cases where the courts have refused to find mutual mistake, the defendants lacked both independent knowledge of the plaintiffs' injuries *and* any contemplation of the plaintiffs' injuries. *See Mygrant,* 471 N.E.2d at 664; *Hybarger v. American States Ins. Co.,* 498 N.E.2d 1015, 1018 (Ind.App. 1st Dist.1986); *Gumberts v. Greenberg,* 124 Ind.App. 138, 115 N.E.2d 504, 507 (1953). Consequently, Jeffery reasons that because Turner had an opinion about the seriousness of Jeffery's injuries, evidenced by his report to Carolina, a mutual mistake exists even if Turner lacked independent knowledge. We disagree. Even assuming that Turner did have a belief about Jeffery's injuries, we read the relevant cases to require independent knowledge by the defendant to find a mutual mistake.

Granted, the cases discuss both contemplation and independent knowledge. However, each court stresses the independent knowledge factor, and all the cases that find only a unilateral mistake distinguish *Crane* on that basis. *See Mygrant,* 471 N.E.2d at 664 (*Crane* distinguishable because there was "no mutual reliance on medical advice"); *Hybarger,* 498 N.E.2d at 1018 (*Crane* inapplicable because all the defendant's information came from the plaintiff, not a physician); *Gumberts,·* 115 N.E.2d at 507 (distinguishing

*Crane*). A complete reading of these cases requires us to reject Jeffery's contention.

Second, Jeffery argues that, assuming independent knowledge ·is a requirement, at the very least there is a genuine issue of fact as to whether Turner had independent knowledge, and thus summary judgment was improper. Based on our foregoing analysis, this argument also must fail. We have concluded that, as a matter of law, the scant information Turner received from the emergency room nurse was insufficient to provide him with the requisite independent knowledge. The facts underlying our conclusion are not disputed. Both parties agree on the contents of Turner's discussion with the nurse and that Turner never examined Jeffery's medical records at the hospital. Therefore, we hold that there is no genuine issue of material fact regarding a mutual mistake and the district court properly granted the defendants' summary judgment motion on this issue.[4]

## IV. Constructive Fraud/Misrepresentation

Jeffery argues next that Turner's representations to the family when they signed the release forms constitute constructive fraud and/or misrepresentation which permits him to rescind his release. According to uncontradicted affidavits submitted by Mr. and Mrs. McWaters, Turner told them that the release document was "only a receipt" to show they received their check.[5] Jeffery argues that this alleged misrepresentation creates a genuine issue of material fact that precludes summary judgment for the defendants.

■ Under Indiana law, constructive fraud allows a party to rescind the resulting

---

4. Underlying the foregoing analysis is our belief that the Indiana Supreme Court's position on mutual mistake in this type of case is discernable. Therefore, we decline the plaintiff's invitation to certify specific questions to the Indiana Supreme Court. *See Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1087 (7th Cir.1990) (concluding Indiana law was clear enough for federal court to ascertain and denying motion to certify).

5. Jeffery also claims that Turner's failure to clarify exactly what the settlement money covered amounts to a misrepresentation. However, both cases Jeffery cites in support of this claim involve affirmative statements, not just silence, by the agent. *See McDaniel v. Shepherd,* 577 N.E.2d 239 (Ind.App. 4th Dist.1991); *Fultz v. Cox,* 574 N.E.2d 956 (Ind.App. 1st Dist.1991). As a result, we base our analysis solely on the plaintiff's allegation that Turner told him the release was a receipt.

release. *McDaniel v. Shepherd*, 577 N.E.2d 239, 245 (Ind.App, 4th Dist.1991).

> The elements of constructive fraud are 1) the existence of a duty due to a relationship between the parties; 2) violation of the duty by making deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate cause thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Id.* at 242. Similarly, a party can rescind a release under the theory of misrepresentation. *Fultz v. Cox*, 574 N.E.2d 956 (Ind.App. 1st Dist.1991). To prevail on a misrepresentation claim, the plaintiff must prove

> that a material misrepresentation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and that another party did in fact rely on the representation and was induced thereby to act to his detriment.

*Peoples Trust & Savings Bank v. Humphrey*, 451 N.E.2d 1104, 1112 (Ind.App. 1st Dist.1983).

According to Jeffery, all the elements of constructive fraud and misrepresentation are present in this case. We disagree. For the following reasons, we conclude that the element of reliance is lacking, which is fatal to both claims.

 Reliance on an alleged misrepresentation must be reasonable. *McDaniel*, 577 N.E.2d at 243. Assuming, as we must, that Turner did tell the McWaters family that they were only signing receipts for their checks, we do not believe that their decision to rely on that statement and not read the release form was reasonable. To demonstrate reasonable reliance, the plaintiff must show not only that he in fact relied on the misrepresentation, but also that he had a right to rely on it. *Plymale v. Upright*, 419 N.E.2d 756, 761 (Ind.App. 1st Dist.1981). We assume that the McWaters family did in fact rely on Turner's statements as they assert in their affidavits. However, we cannot say that they had a *right* to rely on Turner's statements.

The Indiana Court of Appeals explained that:

> The right of reliance ... is tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise common sense and judgment is a practical limitation on the actionability of various representations.... [I]t is [ ] settled that where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment.

*Plymale*, 419 N.E.2d at 762. There is no evidence that the members of the McWaters family were suffering emotional distress during the negotiations or at the time they signed the releases. Nor is there evidence that they are uneducated people. To the contrary, the record reflects that Caston McWaters conducted himself with some degree of sophistication; he checked with his insurance company prior to negotiating with Turner and later was able to obtain $1000 more than the insurance company's initial offer.

After looking at the release document itself, without even reading its text, no rational jury could conclude that the McWaters family reasonably relied in Turner's claim that it was only a receipt. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (question is whether "a reasonable jury could return a verdict for the nonmoving party"). *See also Panozzo v. Rhoads*, 905 F.2d 135, 137 (7th Cir. 1990) (to survive a summary judgment motion, plaintiff "must demonstrate that there is sufficient evidence to support a jury verdict in his favor"). At the top of the document, the release was captioned in bold face capital letters: **"RELEASE OF ALL CLAIMS."** The McWaters family does not allege that Turner concealed any portion of the release form during signing. Unless hidden, it would be impossible for someone signing the release form not to notice the caption. We agree with the district court that "[s]imply a glance at the title" would have alerted

the family members that the document was more than a receipt.

Moreover, we believe that the McWaters family failed to exercise common sense when they chose to rely on Turner's characterization of the release form rather than read the half a page of text in the release form, which told the reader in simple language that he was releasing all claims and carried the following warning immediately above the signature line: "CAUTION: READ BEFORE SIGNING BELOW." "A man who can read and does not read an instrument which he signs is, as a general rule, guilty of negligence...." *Robinson v. Glass,* 94 Ind. 211, 212 (1884). Given all the circumstances, we do not believe that a reasonable jury could conclude that the McWaters family acted reasonably in relying on Turner's statement and failing to read the release document. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Panozzo,* 905 F.2d at 137. Accordingly, for the foregoing reasons, we hold that the McWaters family's reliance of Turner's alleged misrepresentation was unreasonable as a matter of law.

Jeffery asserts several arguments, however, to persuade us that concluding reliance is absent in this case would be erroneous. First, Jeffery argues that his reliance was reasonable, pointing to Turner's friendly behavior. According to Jeffery, during the three meetings, Turner "ingratiated himself by inquiring about Jeffery's health," and generally led the family to believe they could trust him. Therefore, Jeffery reasons that his reliance on Turner's statements, and subsequent decision not to read the release before signing it, was reasonable. In essence, Jeffery is claiming that Turner lulled him into signing the release.

If a party is lulled into believing another's representation as to a document's content or character, he may be able to show reasonable reliance. *Plymale,* 419 N.E.2d at 762. The following language by the Indiana Supreme Court explains why Jeffery's argument must fail:

> Ordinarily, one contracting party has no right to rely upon the statements of the other as to the character or contents of a written instrument ... but while this is true, it is also true that *if a known trust and confidence is reposed in the person making the representations, and there is a relationship justifying such trust and confidence,* then the person to whom the representations are made may rely upon them.

*Id.* (citing *Robinson,* 94 Ind. at 214) (emphasis added). In this case, there was no "known trust" between Turner and the McWaters family. In fact, Caston McWaters' actions, such as refusing to meet with Turner absent the approval of his insurance company and demanding a higher settlement amount, could only be read by Turner as adversarial. Further, there was no relationship between the parties which would justify such trust and confidence. *See Mygrant,* 471 N.E.2d at 664 (no fiduciary relationship exists between releasee and releasor). The fact that Turner behaved in a friendly professional manner does not turn unreasonable reliance into reasonable reliance.

Second, Jeffery directs our attention to *Fultz,* arguing that it mandates a finding of reasonable reliance in this case. In *Fultz,* the plaintiff, Ms. Cox, alleged that she signed a release form without reading it because the insurance company representative told her that it was only a receipt for the settlement of lost wages and property damage claims. 574 N.E.2d at 959. Cox specifically claimed that the adjuster falsely "told her she 'would have to sign saying that [she] received $1,000 and that [she] received it for [her] clothing and [her] lost wages.'" *Id.* (alteration in the original). The court held that the alleged misrepresentation raised a genuine issue of fact and affirmed the denial of the defendants' summary judgment motion. *Id.*

According to Jeffery, under *Fultz,* Turner's alleged "receipt" misrepresentation prevents summary judgment for the defendants in this case. However, the misrepresentation in *Fultz* is not identical to the alleged misrepresentation in this case. In *Fultz,* the adjuster actually made two misrepresentation: the document was a receipt and the document represented settlement for only clothing and lost wages. In the instant case, Turner did not tell the McWaters family that the money was limited to settlement

for past medical bills and a car; rather, he said it was for *"total settlement."*[6] The sole alleged misrepresentation was Turner's statement that the document was only a receipt. Thus, the precise question before us is whether *Fultz* is so similar to our case that it requires us to abandon our conclusion that Jeffery's reliance was unreasonable.[7]

■ While we recognize that similar misrepresentations were made in both cases, this fact alone does not support a conclusion that both cases contain the element of reasonable reliance. The determination of whether reliance is reasonable necessarily requires, *inter alia*, an examination of surrounding facts and circumstances, including the parties' capabilities, not just an examination of the statements alleged to be misrepresentations. Here, *Fultz* offers us no real guidance. The opinion provides very little factual detail regarding the circumstances of the negotiations. We are not told the length, contents or physical appearance of the release document, the adjuster's complete course of conduct, nor the plaintiff's particular vulnerabilities. In short, Jeffery urges us to conclude that his case is of a piece with *Fultz*, but the *Fultz* case itself does not provide us with sufficient facts to determine if these two cases are truly indistinguishable. Consequently, we believe that nothing in *Fultz* precludes our conclusion that reasonable reliance is absent in this case.

Finally, in a related argument, Jeffery argues that under *Plohg v. NN Investors Life Ins. Co., Inc.*, 583 N.E.2d 1233, 1237 (Ind. App. 3d Dist.1992), and *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850 (Ind. App. 1st Dist.1990), we should not decide whether his reliance was reasonable because that question is one of fact for the jury. The *Plohg* court did conclude that "whether a

party's reliance upon an agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder." 583 N.E.2d at 1237. *See also Medtech,* 555 N.E.2d at 850. However, the cases on which Jeffery relies present more complex situations. Both involved a purchaser's failure to completely read a lengthy insurance policy, and misrepresentations about the scope of coverage made by the insurance company's agent. In these circumstances, the courts refused to hold that the purchaser's reliance on the agent's misrepresentations was unreasonable as a matter of law. *Plohg,* 583 N.E.2d at 1237; *Medtech,* 555 N.E.2d at 850.

■ The instant case does not involve a complicated insurance policy, but rather a half page release, identified as such in large bold print, warning the signer to read its contents. As a general rule, Jeffery is correct that the issue of reasonable reliance is one for the jury. *See Plohg,* 583 N.E.2d at 1237; *Medtech,* 555 N.E.2d at 850; *Plymale,* 419 N.E.3d at 763; *Fleetwood Corp. v. Mirich,* 404 N.E.2d 38, 45 (Ind.App. 3d Dist. 1980). Yet reliance can be unreasonable as a matter of law:

> Where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying of the representation and whether he was negligent in doing so.

*Plymale,* 419 N.E.2d at 763 (citing 37 C.J.S. Fraud § 129).

■ We believe that the evidence is only susceptible of one reasonable inference. The McWaters family was negligent in relying on Turner's "receipt" misrepresentation and failing to read the half page release before

---

6. In his deposition, Turner stated that he told the family that he was authorized by the insurance company to give them $2500 for "total settlement." While the McWaters family does not concede that Turner ever used the term "total settlement," they do not deny that he made the statement. Instead, in their statement of genuine issues of material fact, filed with the trial court, the McWaters family claimed only that they believed the $2500 was solely for past medical bills and a new car. We also note that Caston McWaters admits that Turner initially told him that the

insurance company was "willing to settle" for $1500, and that Turner told Jeffery that the release document was to "buy peace."

7. We presume, as Jeffery does, that the *Fultz* court concluded that the plaintiff's reliance was either reasonable as a matter of law or that there was a genuine issue of fact regarding the reasonableness of her reliance; otherwise the court would not have affirmed the denial of the defendants' summary judgment motion.

signing it. Therefore, we hold that, because their reliance was unreasonable as a matter of law, the McWaters family cannot establish an essential element of constructive fraud or misrepresentation and summary judgment for the defendants was properly granted.

## V. Meeting of the Minds/Consideration

Jeffery believes that a genuine issue of fact exists as to whether the release was supported by consideration in the form of a "bargained-for" exchange. In support of this argument, Jeffery relies on *Bogigian v. Bogigian*, 551 N.E.2d 1149 (Ind.App. 2d Dist. 1990). In that case, the court held that a release was voidable for lack of consideration because the parties had not bargained for the exchange. *Id.* at 1151. Jeffery admits that he and Turner did do some bargaining, but maintains that since the parties only discussed medical bills and property damage, there was no consideration supporting the release of his bodily injury claims.

In a related argument, Jeffery argues that the release is invalid because there was no meeting of the minds; the McWaters family thought they received money for medical bills and a car, and Turner thought he gave money for "total settlement." *See McDaniel*, 577 N.E.2d at 244 (meeting of the minds required for valid contract).

Both of Jeffery's arguments ignore the plain language of the release, which unambiguously provides that Jeffery gave up claims for "foreseen and unforeseen bodily and personal injuries" in exchange "for the sole consideration of two thousand dollars."

> The language of a release is important in determining the intention of the parties and, as a general rule, where the intention to settle for unknown injuries is clearly expressed, and there is no fraud or overreaching involved, the release is a bar for injuries subsequently discovered.

*Gumberts*, 115 N.E.2d at 507. Having concluded that there was no fraud or mistake in this case, we believe that the language of the form clearly demonstrates the existence of adequate consideration and a meeting of the minds.

Despite the clarity of the foregoing rule, Jeffery urges us to look beyond the four corners of the release to examine the parties actual intent. At oral argument, plaintiff's counsel suggested that *Huffman v. Monroe County Com. School*, 588 N.E.2d 1264 (Ind. 1992), either permits or requires us to look beyond the release in this case. After reviewing *Huffman*, we find counsel's conclusion to be erroneous.

In *Huffman*, the court abolished the common law rule that the release of one joint tortfeasor released all other tortfeasors. *Id.* at 1267. The court reasoned that a rule which assumed total release did not give appropriate deference to the parties' intent. To remedy this failing, the court held that a release should be interpreted like any other contract—"with the intent of the parties regarding the purpose of the document governing." *Id.* Nothing in this new rule addresses the appropriate method for determining the parties' intentions, and nothing in this new rule is inconsistent with our conclusion.

In fact, the *Huffman* court's complete analysis sheds an unfavorable light on Jeffery's contention. In applying the new rule, the court stated:

> The release document in this case cannot be said to be "clear and unambiguous" on its face.... These contradictory references cloud the intent of the document. Consequently, parol evidence may be utilized to determine the parties' true intention respecting the document's application.

*Id.* The release Jeffery executed is not ambiguous; instead, it makes very clear that he released claims for unforeseen injuries. In the absence of ambiguity, *Huffman* does not require or permit us to look beyond the language of the release. Therefore, we hold that the release is not voidable for lack of consideration or lack of a meeting of the minds.

## VI. Conclusion

The plaintiff's motion to certify questions to the Indiana Supreme Court is DENIED. Because Jeffery McWaters executed a valid release and has failed to demonstrate that any legal theory entitles him to void it, we

hold that his claim is barred and AFFIRM summary judgment for the defendants.