Armen S. **MINASIAN** and Jon Ansari, Plaintiffs–Appellants,

v.

**STANDARD CHARTERED BANK, PLC, Defendant–Appellee.**

No. 96–2445.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1997.

Decided March 28, 1997.

Dean A. Dickie (argued), D'Ancona & Pflaum, Chicago, IL, Aimee Storin Harrison, Monahan & Cohen, Chicago, IL, Mary P, Benz, Quinlan & Crisham, Chicago, IL, for Plaintiffs–Appellants.

Walter C. Greenough, J. Mark Fisher (argued), Stephen J. Bonebrake, Schiff, Harden & Waite, Chicago, IL, for Defendant–Appellee.

Before ESCHBACH, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Par-Inco, Inc., borrowed $1,850,000 from Standard Chartered Bank to finance an oriental rug business. The loan was secured by the firm's inventory and backed up by guarantees of its principals, Armen Minasian and Jon Ansari. When the loan came due at the end of 1991, Par–Inco did not pay. Ultimately the Bank agreed to an amortization schedule. (At the same time, Minasian Rug Corporation, Amiran Corporation, and Kayam International, Inc., stepped into the shoes of Par–Inco. This detail does not affect anything, so for simplicity we refer throughout to Par–Inco as the borrower.) Par–Inco promised to remit the receipts of sales to a cash collateral account to pay down the bal-

ance; it also promised to send the Bank monthly reports of inventory and accounts receivable, and provide access to the firm's books and records. Yet it deposited only a pittance in the account, donated some of the collateral to charity, did not send monthly reports, and rebuffed the Bank's efforts to examine the books. The Bank declared a default and demanded immediate repayment; Par–Inco did not comply.

Next the Bank called on Par–Inco's principals to fulfil their guarantees of its obligations. Minasian and Ansari had promised to pay on demand, and not to assert any defense based on the underlying transaction. Nonetheless, they refused to pay. Seeking leverage, they filed this suit contending that the Bank had defrauded them. The Bank removed the action to federal court. Because it is a citizen of the United Kingdom, 28 U.S.C. § 1332(a)(2) supplies jurisdiction. By the time the district court granted summary judgment to the Bank, Par–Inco had retired the loan, mooting plaintiffs' request for reformation of the contracts and the Bank's counterclaim on the debt. This did not end the dispute, however, for the guarantors had promised to pay the attorneys' fees the Bank incurred in collection. They refused to perform this portion of their obligations, just as they had refused to cover Par–Inco's debt. After additional litigation, the district court awarded the Bank about $110,000 in attorneys' fees, and the guarantors have appealed.

Minasian is a retail dealer in oriental rugs, with most of his outlets in the Chicago area. Ansari is an importer of rugs. The two decided to enter the New York retail market by buying a business operated by Abdolreza Parvizian, whose inventory financing was supplied by the Bank. Parvizian had a line of credit with a balance of some $2.5 million and a cap of $3.8 million. Minasian and Ansari agreed with Parvizian to assume $1,350,000 of his debt to the Bank, but they hoped that the Bank would write the check to itself by extending them too a loan—indeed, the contract made the transaction contingent on the buyers' belief that they would be able to obtain $4 million in credit, without "parent company guarantees or oth-

er support." Discussions between Par–Inco and Stephen Wahl, the oriental rug financing manager at the Bank's New Jersey office, led Par–Inco to believe that the Bank would be cooperative. But Wahl did not have the final word, as Minasian and Ansari knew. Only the New York office could approve a loan of the magnitude Par–Inco sought. Managers in New York had grown skeptical of the Bank's portfolio of oriental rug loans; one memo, turned over during discovery, characterized the Parvizian loan as a risky one that could be justified only by a strong personal relationship. Perhaps the Bank had one with Parvizian; it did not develop one with Par–Inco's principals.

Par-Inco asked the Bank to make a firm loan commitment in time for the closing, scheduled for October 4, 1990. What they received fell short. Although the Bank's letter began by expressing interest in financing Par–Inco on terms "very similar" to those extended to Parvizian, it continued: "Please understand that this letter is not a commitment, a contract, or an offer to enter into a contract and should not be deemed to obligate the Bank in any manner whatsoever. Our consideration for your financing request is subject to a credit approval and the satisfactory negotiations of a loan agreement with terms and conditions satisfactory to the Bank, which may not be limited to those requirements mentioned above." The letter added that the Bank would require guarantees from the principals. At this point Par–Inco could have walked away; financing had not materialized. Par–Inco closed the purchase anyway and continued to seek a loan from the Bank. Negotiations were protracted. Reluctance to supply financial documents or guarantees—which might have alerted the Bank to trouble ahead—delayed the extension of credit until April 1991. Even then the Bank was willing to lend only $1,850,000, rather than the $2.5 million balance, and even higher maximum, Parvizian enjoyed.

According to Minasian and Ansari, Wahl led them to believe that a loan comparable to Parvizian's would be forthcoming, knowing full well that this would not happen—that the Bank was winding down its financing of the

oriental rug business. Had they known the truth, they contend, they would not have closed the purchase from Parvizian and would not have sustained the losses they incurred in operating the acquired business, losses they want the Bank to absorb. As support for this contention, plaintiffs note that in December 1990 the Bank denied Parvizian's application for an extension of his line of credit. Although the Bank replies, with some support in the record, that this decision surprised Wahl, who recommended renewal, as well as the manager of the New York branch (who endorsed Wahl's recommendation), the district court was willing to assume that plaintiffs could establish that the Bank had, and Wahl knew about, a plan to pare back its volume of lending to oriental rug merchants, and ultimately to withdraw from this segment of the market. Still, the court held, there is no material dispute, and thus no need for a trial, about the question whether Par–Inco and its principals relied on Wahl's statements. Before they closed with Parvizian, Minasian and Ansari knew that the Bank was unwilling to substitute Par–Inco for Parvizian. As of October 4 the Bank had indicated interest in lending to Par–Inco, but financing was made conditional on credit approval plus guarantees that the buyers did not want to supply (and ultimately did not honor).

 Choice-of-law clauses in the guarantees provide for the application of New York law. Both sides nonetheless assume that New Jersey supplies the law for plaintiffs' fraud claims, perhaps because Wahl was based there and perhaps because the loan agreement between Par–Inco and the Bank specifies New Jersey law. We accept this concord, without vouching for it as an original matter. In New Jersey, as in most other states, a person claiming to be the victim of commercial fraud must show that he justifiably relied on the other party's false statement. *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 142–43 (1983); *International Minerals & Mining Corp. v. Citicorp North America, Inc.,* 736 F.Supp. 587, 598 (D.N.J.1990). *Cf. Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Although we cannot find a New Jersey case squarely on point, plaintiffs offer no reason

to suppose that New Jersey would depart from the principle—vital to the stability of contracts—that one cannot rely on an oral statement that is squarely contradicted by a written disclosure of the truth. See *Carr v. CIGNA Securities, Inc.,* 95 F.3d 544 (7th Cir.1996); *McWaters v. Parker,* 995 F.2d 1366 (7th Cir.1993); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 529–30 (7th Cir.1985); *Jackvony v. RIHT Financial Corp.,* 873 F.2d 411 (1st Cir.1989) (Breyer, J.). If Wahl said what plaintiffs say he did, and knew what plaintiffs say he knew, the fact remains that, before they closed what they now contend was a bad deal, plaintiffs knew that the Bank was *not* committed to extending Par–Inco the same line of credit Parvizian had. It would sorely upset the institution of contract to treat as fraud a corporation's refusal to honor the promise of an underling who had neither actual nor apparent authority.

The letter of October 4 cannot itself be called fraudulent. It began with an expression of desire to do business, but many a potential business partner includes such language in proposals without giving rise to damages if a contract on beneficial terms does not ensue. A firm can promise to negotiate without committing itself to make a deal. See *Venture Associates Corp. v. Zenith Data Systems Corp.,* 96 F.3d 275 (7th Cir.1996); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810 (7th Cir.1987). As plaintiffs see things, the Bank was leading them on to get a more solvent borrower to replace Parvizian. Yet, if that was the Bank's goal, its means were ill adapted: it should have invited Par–Inco to sign on the dotted line on October 4, and then slowly reduced the maximum exposure in months to come. What the Bank actually did invited Par–Inco to go elsewhere for credit, leaving the Bank to collect, if it could, from Parvizian after his business had been sold. What is more, despite plaintiffs' claim that the Bank never intended to make a loan, the Bank *did* negotiate and *did* lend Par–Inco $1,850,000. Plaintiffs were free to approach every other bank and commercial factor in the world and did not have to take the money from Standard Chartered Bank if they thought the line

of credit too low or the conditions onerous. Having come to terms with the Bank, the plaintiffs must keep their part of the bargain. *Continental Bank, N.A. v. Everett*, 964 F.2d 701 (7th Cir.1992).

■■■ Plaintiffs tendered an affidavit from Richard T. Schroeder, a former banker, in an effort to stave off summary judgment. Like the affidavit in *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir.1989), this document does little beyond demonstrating how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir.1996). Our district judge was not snookered. Schroeder's affidavit exemplifies everything that is bad about expert witnesses in litigation. It is full of vigorous assertion (much of it legal analysis in the guise of banking expertise), carefully tailored to support plaintiffs' position but devoid of analysis. Schroeder must have allowed the lawyers to write an affidavit in his name. He does not identify and test any hypothesis; he does not identify hypotheses considered and rejected; indeed, he does not suggest any way in which his views may be falsified. For example, Schroeder declared that it was not "commercially reasonable" for the Bank to declare Par–Inco in default, just because it gave away collateral, failed to deposit proceeds into a cash collateral account, neglected to inform the Bank of the status of the collateral, and refused to allow inspections of its books. This assertion (a) is unreasoned; (b) is economically ludicrous (a secured creditor is vitally interested in the status and disposition of the collateral); (c) ignores the contract between Par–Inco and the Bank, which made violation of the commitments concerning collateral good reasons to accelerate payment and did not require that the defaults be material; and (d) is legally irrelevant—for Par–Inco is not a party to the case, and the two guarantors waived their ability to assert any defenses specific to the transaction between Par–Inco and the Bank. The Bank was entitled to enforce the loan agreement and guarantees according to the terms they contain, rather than according to terms an expert (or judge) thinks they ought to have contained. See *Investors Savings & Loan Ass'n v. Ganz*, 174 N.J.Super. 356, 416 A.2d 918, 920 (N.J.Super.Ch.1980); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356–57 (7th Cir.1990); *Everett*, 964 F.2d at 705. Schroeder asserts that banks just don't accelerate the principal indebtedness because of shortcomings of the kind Par–Inco displayed. Apparently we are supposed to take this on faith, because Schroeder did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion. An expert is entitled to offer a view on the ultimate issue, see Fed. R.Evid. 704(a), but an expert's report that does nothing to substantiate this opinion is worthless, and therefore inadmissible. "An 'opinion has a significance proportioned to the sources that sustain it.' *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank*, 253 N.Y. 23, 25, 170 N.E. 479, 483 (1930) (Cardozo, J.). An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid–State Fertilizer*, 877 F.2d at 1339. That conclusion applies with full force to Schroeder's affidavit.

■■■ Now for the subject of attorneys' fees. Minasian and Ansari promised to indemnify the Bank for outlays, including legal fees, incurred in collection. Their principal argument—that this provision applies only to third-party disputes—is beside the point: a dispute between debtor and creditor *is* a third-party controversy from a guarantor's perspective. Their fallback is that, because Par–Inco eventually paid, the Bank didn't have to devote legal time to collection. Yet defaults concerning the collateral, and refusal to pay the accelerated debt, put the Bank's funds at extra and uncompensated risk. Expenditures to curtail the risk were economically prudent. Minasian and Ansari could have reduced the Bank's exposure, and ended its need for legal precautions, by covering the debt, as they promised to do. This was the transaction to which they agreed: if Par–Inco does not pay, then Minasian and Ansari must make the Bank whole and collect from

Par–Inco as the Bank's subrogees. Instead of keeping their bargains, Minasian and Ansari commenced this suit and forced the Bank to bear the entire risk of non-collection. We agree with the district court that the Bank's legal outlays were prudently incurred. Plaintiffs' remaining arguments have been considered but do not require separate discussion.

AFFIRMED.