Eppie CHANG, Plaintiff–Appellant,

v.

MICHIANA TELECASTING CORP., et al., Defendants–Appellees.

No. 89–2044.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1990.

Decided April 24, 1990.

Thomas J. Brunner, Jr., Richard W. Snyder, Baker & Daniels, South Bend, Ind., Sidney Herman, David Stryker, Kirkland & Ellis, Chicago, Ill., Victor Arko, Elkhart, Ind., Candice A. Lichtenfels, South Bend, Ind., for plaintiff-appellant.

Stephen M. Terrell, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Philip E. Kalamaros, South Bend, Ind., E. Nelson Chipman, Plymouth, Ind., Robert T. Sanders, III, Elkhart, Ind., Daniel P. Byron, Robert B. Scott, McHale, Cook & Welch, Indianapolis, Ind., Jonathan D. Hart, Robin H. Sangston, Andrew A. Merdek, Dow, Lohnes & Albertson, Washington, D.C., for defendants-appellees.

Before WOOD, Jr., CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

On April 28, 1986, station WNDU–TV in South Bend, Indiana, broadcast a story by reporter Teri Meade that Miles Laboratories had charged Eppie Chang, one of its scientists, with stealing its trade secrets. Meade added that according to a confidential source Chang planned to flee to Taiwan, where a firm had offered $1 million for information about Miles' glucometer. Jim Miller, a reporter for *The Elkhart Truth*, heard the broadcast and prepared a story about the subject. (Miles, a firm with worldwide operations, has its headquarters in Elkhart, Indiana.) As published the next day, the story included this paragraph:

> The woman reportedly was offered $1 million by a Taiwan concern to provide the secret information on Miles' glucometer, a device Miles developed to test for sugar in blood.

Chang filed this diversity action charging Meade, Miller, and the corporate owners of WNDU and *The Elkhart Truth* with libel. Assuming (as do we) that all statements concerning the $1 million offer are false, the district judge granted summary judgment for the defendants, holding that Chang could not establish by clear and convincing evidence that the defendants acted with "actual malice".

The "actual malice" standard comes from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in which the plaintiff was a public

official. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), holds that the Constitution does not require states to employ the "actual malice" standard when a plaintiff who is not a public figure or official seeks actual damages. See also *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Eppie Chang was not a public figure when the story broke. States may elect, however, to give speakers greater protection than the Constitution requires. In *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (3d Dist.1974), a panel of the state's court of appeals held that in Indiana even private figures must establish actual malice, if the statements relate to an issue of public concern.

*Aafco* puts Indiana among a small minority of states. According to Rodney Smolla, *The Law of Defamation* § 3.11 (1989 ed.), only four (Alaska, Colorado, Indiana, and New Jersey) require a private-figure plaintiff to prove actual malice. Michigan recently switched to a negligence standard, *Rouch v. Enquirer & News*, 427 Mich. 157, 398 N.W.2d 245 (1986), and a federal court has predicted that Alaska will follow suit when it has the chance, *Sisemore v. U.S. News & World Report, Inc.*, 662 F.Supp. 1529 (D. Alaska 1987). *Moffatt v. Brown*, 751 P.2d 939 (Alaska 1988), which rejects the "clear and convincing proof" requirement in private figure cases, suggests that *Sisemore* may be prescient. *Aafco* itself was the product of a divided panel, and in a later case, *Patten v. Smith*, 172 Ind.App. 300, 360 N.E.2d 233 (3d Dist.1977), Judge Garrard, the author of the dissent in *Aafco*, picked up the support of a newly appointed colleague, Judge Hoffman. *Patten* did not overrule *Aafco*, but Chang contends that the state of the law in Indiana is so uncertain, and the support among state courts for the actual malice test so sparse, that we should certify a question to the Supreme Court of Indiana so that it may decide for itself.

We certify questions to ensure that "the law we apply is genuinely *state* law, and not a federal court's perception of what state judges ought to hold". *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1441 (7th Cir.1988) (emphasis in original). We do not reflexively certify when parties dispute the meaning of the state's rules. Law may be knowable even though the topic is contentious. If we had nothing but *Aafco* and *Patten* to go on, we would think the law of Indiana muddy. Two subsequent cases have followed *Aafco*, deeming it authoritative. *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1218 & n. 3 (2d Dist.1978); *Elliott v. Roach*, 409 N.E.2d 661, 685–86 (Ind.App. 4th Dist.1980). No Indiana court has disagreed with *Aafco*, and four years ago we took *Aafco* to be the established law of Indiana. *Woods v. Evansville Press Co.*, 791 F.2d 480, 483 (7th Cir.1986). See also *Gintert v. Howard Publications, Inc.*, 565 F.Supp. 829, 838–39 (N.D.Ind.1983). We rarely certify a question to state court unless there is disagreement among the inferior state tribunals or unless, as in *Covalt*, all cases of a given kind have been filed in federal court, so that the state has never had a chance to begin the development of its own jurisprudence.

*Aafco* has drawn adverse comment from several judges of Indiana—not only Judges Garrard and Hoffman but also the panel in *Cochran*, which expressed doubts but followed *Aafco* to maintain uniformity. Yet it does not stand alone, and although the trend in other states is against it, New Jersey adopted the actual malice standard even as Michigan abandoned it. *Sisler v. Gannett Co.*, 104 N.J. 256, 516 A.2d 1083 (1986). New York uses an intermediate approach, *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y. S.2d 61, 341 N.E.2d 569 (1975), and decisions of appellate courts in California go both ways, see Smolla (collecting cases). Skepticism among Indiana's judges is not the same as conflict in decision. *Aafco* is straightforward and, for the moment, the reigning expression of state law. The Supreme Court of Indiana has had ample opportunity to express a different view and has so far elected not to do so. Our approach is therefore governed by the princi-

ple that a litigant whose case depends on a change in state law had best start in state court. Chang could have commenced this suit in a court of Indiana; instead she filed in federal court, lost, and wants a second opinion. "Federal judges are disinclined to make bold departures in areas of the law that we have no responsibility for developing." *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985). We are equally disinclined to afford Chang direct entrée to the Supreme Court of Indiana when she could have taken her case there in the regular course. *Aafco, Patten, Cochran, Elliott,* and *Woods* all were decided before Chang filed her complaint. She has not been bushwhacked by a surprising interpretation of state law; the district judge applied to her claim the principles *Woods* held should be applied.

Chang needs a change of Indiana's law to prevail in this case, for the record would not permit a jury to find by clear and convincing evidence that the defendants acted with malice—meaning that they knew that what they wrote was not true, or strongly suspected that it was untrue yet were recklessly indifferent to this. *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726; *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). (State law has taken over from these cases the definition of "malice". See *Cochran*, 372 N.E.2d at 1219.) Summary judgment was accordingly proper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309 (7th Cir.1988).

The chain leading to the publications starts with a phone call to Meade on Saturday, April 26, 1986. The caller would not identify himself except to say that he is the son of a senior officer of Miles, and that his father would "kill him" if he knew that he was leaking the facts. (The caller has since made himself known: Grant Ringuette, son of Miles' general counsel. So far as we know, Grant is alive and well.) The caller told Meade that he had a "big story" about "industrial espionage"—Eppie Chang, a scientist at Miles, planned to

leave for Taiwan to sell documents, and Miles had gone to court to stop her. In a second call, the tipster told Meade Chang's full name, where she lived and worked, that she was working on a glucometer and had been caught copying trade secrets, which she planned to sell for a million dollars or more. Meade discussed these calls with her producer; they decided to verify the information rather than broadcast immediately. On Monday, April 28, Meade obtained a copy of the complaint from the district court in South Bend. The core allegation of the complaint reads:

On the evening of April 24, 1986, certain Miles employees discovered in Defendant, Chang's, office and at the photocopy machine in close proximity to her office, materials that indicate that Defendant, Chang, had access to and misappropriated protectable trade secrets belonging to Miles. Such material indicated that Defendant, Chang, was preparing for a meeting in Taiwan with potential competitors of Miles at which such protectable trade secrets would be discussed and disclosed. On information and belief, Defendant, Chang, has participated in meetings in this country at which Miles' protectable trade secrets may also have been disclosed.

The complaint also alleged that Chang was a scientist employed by Miles and that the trade secrets were "of great value and importance to the business of Miles".

After learning that her caller must have had access to information straight from Miles Laboratories, Meade spoke by phone with Chang. She revealed that she was indeed planning to leave Miles because she was dissatisfied with her position, and was planning a trip to Taiwan, although not, she insisted, to sell trade secrets. On advice of counsel, Chang declined an opportunity to be interviewed on camera; her lawyer would not discuss the case at all. Meade and a camera crew obtained some videotape of Chang entering her lawyer's office Monday afternoon. That evening Meade broadcast her story, including the tipster's assertion that Chang had been offered $1 million for trade secrets about a

glucometer. Neither the complaint nor any other source of information backed up this aspect of the tipster's tale. Meade, who did not try to discuss the subject with anyone at Miles, says that she accepted the tipster's word because she had verified other parts of his story and nothing he said had been shown to be false.

Jim Miller heard Meade's broadcast at 6:00 p.m. on April 28. The next morning he, too, visited the courthouse and read the complaint, discovering that it mentioned nothing about $1 million or a glucometer. Miller called Miles' public information officer; she refused to comment on the subject. Miller's editor was dissatisfied with his draft story because it did not mention the most tantalizing aspect of Meade's broadcast. Miller then added the paragraph we have quoted; its sole source is the WNDU telecast.

Chang protested to WNDU and the *Truth* that their stories, like Miles' complaint, were untrue. Both stuck by their guns except to the extent they reported that Chang had been offered $1 million for secrets about a glucometer. The *Truth* published a retraction of that portion of its story. WNDU broadcast a "correction" (which Chang says made things worse, because the station repeated the allegation before "correcting" it). WNDU also fired Meade, on the ground that she violated the station's policy by broadcasting information provided by a source whose identity she did not know, without telling the station's news director the limits of her knowledge. Still not satisfied, Chang filed this suit in early 1987 and lost on summary judgment. Miles' suit against Chang was settled in late 1989, so neither case has produced a decision on the truth of the allegations concerning her conduct.

It is not clear to us that Indiana would treat as libelous an allegation that someone was *offered* a lot of money for trade secrets. A scientist's professional integrity would be impugned by the allegation that she planned to accept, but that aspect of the story was a privileged summary of the information in Miles' complaint. An assertion that the secrets concerned a "glucome-

ter" as opposed to some other device or process does not add any sting to the assertion that Chang planned to betray her trust. The most that can be said is that the $1 million figure and the reference to the glucometer added verisimilitude to the story, so that listeners would be more likely to believe the allegations from the complaint that WNDU and the *Truth* repeated; the increased force of the assertions might impair Chang's reputation in an actionable way. See *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C.Cir. 1984) (Scalia, J.), reversed on other grounds, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Still, as the district court held, the assumption that this aspect of the stories was actionable does not assist Chang, for she did not show that the reporters acted with malice.

■ Although Chang emphasizes that Meade did not confirm from a second source everything the tipster told her, this does not show reckless indifference to the truth. Meade attempted to verify her source's claims; everything she could verify suggested that (a) the source has inside knowledge, as he asserted, and (b) he was relaying his knowledge accurately. Her tipster was not the "unverified anonymous telephone call" that *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326, implied it would be reckless to rely on. Meade did what police officers often do on receiving tips: verify what you can, and if everything you observe checks out then assume the rest of the story is true. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), holds that this process may yield "probable cause" for an arrest. Even though the police are able to verify only "innocent" information, this may imply that the informant has access to knowledge, which he has relayed accurately. Meade's source told her things that a bystander could not have known. Because the complaint had been filed after 6:00 p.m. on Friday, April 25, when the district court was closed to the public, the tipster had to have inside knowledge. Just as police need not pursue all leads before pouncing, *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir.1986), reporters need not

keep calling additional sources on pain of damages. Meade's failure to call Miles' press office—a dry well for Miller—is not a basis on which to keep the case alive. A method of inference that yields "probable cause" in law enforcement cannot logically be damned as reckless when employed by reporters.

Some of Meade's tactics are questionable. Ambushing someone to get videotape and going on the air without telling your superior that you do not know who supplied your information may not inspire rave reviews; for Meade they won a pink slip rather than a Pulitzer Prize. Still, Indiana does not use the law of libel to enforce journalistic ethics.

The only colorable basis for inferring malice is that Meade's notes relating to this story have vanished. Pages in her pad before and after the Chang story were found; the three pages on which Meade took the notes for this story are gone, and Meade denies knowing how that happened. We held in *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134–36 (7th Cir.1987), that a reporter's destruction of his notes permits an inference of malice. Why destroy notes that support your story? The destruction could imply that the notes would have revealed that the reporter did not believe what he wrote or said.

If Meade "destroyed" her notes, that would be a powerful weapon for the plaintiff. It is only a small step, Chang insists, to infer that missing notes have been destroyed. Chang might have a point if Meade's source had remained anonymous. Grant Ringuette, the tipster, surfaced and testified in a deposition that he told Meade everything Meade says he did. Chang does not suggest that Meade ever developed reason to doubt what Ringuette said. The notes are significant only as contemporaneous records of the telephone conversations. Given the concord of the parties to these conversations on what was said, any inference from the missing notes could not supply clear and convincing evidence of malice unless Meade wrote something like: "Tipster says X, but because I have not verified it I know X is untrue." Reporters do not write such notes to themselves, and the possibility that Meade jotted down thoughts showing her disbelief of the source's claims is so remote that it does not defeat a motion for summary judgment.

■ Miller has a tougher task than Meade in the sense that Miller never talked to Ringuette. He had only Meade as a "source" of the $1 million allegation. Republication of a libel may not be justified on the ground that the republisher had no reason to doubt the veracity of the original libeler. If that were the law, all republication would be privileged; it is not. *Branstetter v. Dorrough*, 81 Ind. 527 (1882); see also Prosser & Keeton, *The Law of Torts* 799–801 (5th ed. 1984).

■ In the world before *Gertz* held that the Constitution requires at least negligence to support an award of damages for libel, every speaker needed his own privilege. If Reporter A had a privilege, Reporter B (the republisher) might not have it. See *Restatement (2d) of Torts* § 578 (1965). When liability depends on mental states, however, the speaker need not establish a personal privilege to defame. The victim must show, instead, that the speaker had a forbidden state of mind. So if Chang were able to show that Miller had established to his own satisfaction that Meade's story was untrue, then Miller could be liable even though Meade herself did not have the mental state necessary for liability. Nothing in the record suggests, however, that Miller developed a basis for doubting Meade's story. He confirmed Meade's work in the same way Meade confirmed Ringuette's claims: by verifying from the complaint all except the $1 million offer for the glucometer. Chang does not argue that Meade was a notoriously unreliable reporter. Cf. *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir.1982). Miller's mental state was no different from Meade's; this is as close to straight republication as one comes. Chang has not brought to our attention any case finding actual malice in republishing a libel, the initial publication of which was supported by adequate investigation. We could not find such a case and are confident that

Indiana would not impose greater liability on a republisher whose own mental state is closer to vacant than to malicious. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325.

AFFIRMED.