**Virgil JEAN, Plaintiff–Appellant,**

v.

**William E. DUGAN, Defendant–Appellee.**

**No. 93–2047.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1993.

Decided March 24, 1994.

J. Charles Sheerin (argued), Michigan City, IN, for plaintiff-appellant.

Louis E. Sigman, Dale D. Pierson (argued), Pasquale A. Fioretto, Baum & Sig-

man, Chicago, IL, Joseph S. Irak, Merrill-ville, IN, for defendant-appellee.

Before BAUER, WOOD, Jr., and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

In this diversity case, Virgil Jean ("Jean"), a resident of Indiana, filed a three-count complaint seeking damages and injunctive relief against William Dugan ("Dugan"), a resident of Illinois. In Count I, Jean alleged defamation on the basis of various statements made by Dugan in 1988 and 1989. In Counts II and III, Jean raised employment-based claims, alleging unlawful retaliation and interference with contractual relations. The district court granted summary judgment for Dugan on all three counts. We affirm.

## I.

This case arises from a rather severe falling out between two elected officials of the International Union of Operating Engineers, Local 150, AFL–CIO ("Local 150"). Local 150 is a labor organization within the meaning of § 2 of the National Labor Relations Act ("NLRA") and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 142, 152(5), and § 3(i) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 402(i). More specifically, Local 150 is a voluntary unincorporated association of heavy equipment operators and other employees organized in eight district offices throughout Northern Indiana, Northern Illinois, and Eastern Iowa with its principal headquarters located in Countryside, Illinois.[1]

Under the Constitution of the International Union ("Union Constitution") and the By-Laws of Local 150, the membership of Local 150 must hold regular elections to fill the offices of President–Business Manager, Vice President, Recording–Corresponding Secretary, Financial Secretary, and Treasurer. Article X, § 2 of the By-Laws provides that terms of office "shall continue for three years or until the installation of a successor, the officer's resignation or his removal by impeachment." In August 1986, defendant-appellee William Dugan, a resident of Illinois, was elected President–Business Manager and plaintiff-appellant Virgil Jean, a resident of Indiana, was elected Financial Secretary.[2]

Soon after the election, Dugan, acting under his authority as President–Business Manager, appointed Jean to the position of Business Representative and named Jean as a Trustee of the Midwest Operating Engineers ("MOE") Welfare Fund.[3] Thus, as of September 1986, Jean held three union positions—Financial Secretary, Business Representative, and Trustee. Neither the Union Constitution nor the By-Laws mandated that Local 150 remunerate Jean for his services, but Local 150 did, in fact, authorize the payment of a salary, the use of a business credit card, and access to a union-owned automobile as compensation for Jean.

---

1. The Countryside office receives the vast majority of dues payments, issues membership cards, houses financial records, and is the venue for regular meetings of the union officers.

2. The By–Laws of Local 150 provide that "[t]he duties of all officers of this Local Union shall be in accordance with the International Constitution, and as provided herein." Art. XI, § 2. According to the Constitution,

   The Business Manager shall be the chief executive officer of a Local Union. He shall appoint any and all representatives, agents, and assistants, whose wages and allowances shall be determined as provided in the Local Union's bylaws. They shall work directly under his supervision. He may terminate them at any time.

   Art. XXIV, Subdivision 1, § (a). The Union Constitution also spells out the duties of the

Financial Secretary. Art. XXIV, Subdivision 2, § (d).

   In addition, under the By–Laws, the President–Business Manager and the Recording–Corresponding Secretary are expressly considered "Full–Time Officers" entitled to a salary and expense account. Art. XIX, § 1. Other officers, including the Financial Secretary, may be employed full-time and their compensation is "determined in the same manner as that of other employees of the Local Union." Art. XIX, § 2.

3. Article XI, § 1, of the By–Laws authorizes the President–Business Manager "to appoint all business representatives and other employees who shall be directly responsible to him, set salaries and have full power to lay off or terminate the employment of such employees."

As Business Representative, Jean interacted extensively with companies which employed members of Local 150. Jean's alleged dealings with one such company, Hebron Plumbing & Heating Company ("Hebron") precipitated his falling out with Dugan. Hebron signed two memoranda of agreement with Local 150, one dated October 28, 1981, and the other February 13, 1987, by which Hebron adopted collective bargaining agreements negotiated by the union and various construction industry multi-employer associations. Pursuant to the terms of the master agreement, Hebron undertook an obligation to make various contributions to the MOE fringe benefit funds ("the Funds").[4] After Thomas Hartman, a Hebron employee and a member of Local 150, inquired about his eligibility for benefits, the MOE fund office requested an audit of Hebron's payroll records, but Hebron refused to permit one. The Trustees of the various funds then filed suit in federal court to compel an audit. *William E. Dugan, et al. v. Hebron Plumbing and Heating, Inc.,* No. 88 C 0311 (N.D.Ind.). There, Hebron argued that it was not required either to submit to an audit or to make contributions because of a "side agreement" between Hebron and Jean.

Thereafter, Dugan launched an investigation to determine whether certain Business Representatives, including Jean, were not enforcing the obligation of various companies to contribute to the funds. In the course of this investigation, Dugan met with Jean and asked him to take whatever steps necessary to straighten out the problem and ensure that the contributions would be paid. Jean contends that he first learned of Hebron's alleged failure to pay its required contributions at this meeting. When questioned on this matter, Jean informed Dugan that Local 150's former Financial Secretary, Harry Bak-

er, had told the Business Representatives that owner operators were not required to contribute for themselves. In his affidavit,[5] Jean vigorously disputes that this admission was tantamount to an acknowledgment that he had made a "deal" with any contractors regarding the payment of nonpayment of contributions on behalf of employees. Essentially, Jean maintains that any statements he made about contributions merely conformed to the instructions he was given. When Dugan responded that such instructions were incorrect, Jean replied, "Right or wrong, that is what we were told to say and that is what we told them." Dugan then repeated his order to resolve the matter and also asked Jean for a list of contractors which had been given the incorrect instructions.

In response to Dugan's order, Jean and another Business Representative named Tom Kuiper met with the owner of Hebron to urge him to permit an audit and to satisfy Hebron's obligation to contribute to the funds. The Trustees eventually audited Hebron and found a deficiency of about $40,000 in contributions. In the course of the litigation between the funds and Hebron, the Funds' attorneys discovered that Hebron possessed a list of the area contractors which had been told they did not have to pay contributions. The Funds' attorneys then informed Dugan in early December 1988 of Hebron's possession of official union documents (without the knowledge and authorization of the union) and recommended that Jean be questioned about this matter.

On December 7, 1988, Dugan and the Funds' attorneys met with Jean prior to the scheduled meeting of the various MOE funds. Jean first denied and then conceded that he had given documents or lists to Hebron. Specifically, Jean admitted that he

---

4. Employee eligibility for pension and health insurance benefits is dependent upon the payment of employer contributions to the MOE funds on behalf of the individual employee.

5. Though several paragraphs of Jean's affidavits were stricken by the district court as inadmissible under Rule 56(e) of the Federal Rules of Civil Procedure because they were based on hearsay or not based on his personal knowledge, paragraph 31 of his first affidavit remains part of the

record of this case. In Addendum B to his appellate brief, Jean raises several objections to the district court's admissibility rulings. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Flores,* 5 F.3d 1070, 1080 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994). Applying this test to those paragraphs of the affidavits that Jean contends should have been admitted, we find no reversible error.

provided Hebron with copies of various memoranda of agreements with other employers. According to Dugan's affidavit, when asked why he would divulge such confidential information to Hebron, Jean responded that he would do it for anybody, notwithstanding the fact that Hebron's president may have been his friend. In his affidavit, Jean maintains that he delivered the documents to Hebron because he "believed himself to be under an order of court to produce those documents and because he believed that they were not confidential documents and would be producible in collective bargaining."

Following the interview, Dugan excused Jean from attending the Trustees' meeting. Dugan later advised the Trustees that on the basis of the information he had received, Dugan felt that he had no alternative but to remove Jean as a Trustee. On December 12, 1988, Dugan informed Jean that he had been removed as a Trustee. Dugan also suggested that Jean resign as a Business Representative in order to avoid personal embarrassment. When Jean refused to resign, Dugan fired him as a Business Representative of Local 150. In particular, Dugan told Jean that, as President–Business Manager, Dugan could not tolerate Jean's conduct and could not keep Jean on the union's payroll. Dugan further instructed Jean to return his union-owned car and credit card. The following day Jean did turn in his car keys and credit card. Jean received his full semi-monthly salary through December 15, 1988, and a Christmas bonus check later that month. He did not receive a payroll check for the second half of December, 1988, which, but for his termination, would have arrived in the first part of January, 1989.

On December 16, 1988, Jean prepared a letter that he wanted printed in the January, 1989, issue of the *Local 150 Engineer*, an intra-union publication. On December 22, 1988, Jean submitted to Dugan an additional statement that he wished to read or have read at the union's various central and district meetings. Both of Jean's requests were honored. The January, 1989, issue of the *Local 150 Engineer* contained both Jean's letter and Dugan's response and Jean's additional statement was read at the various meetings.

Soon thereafter, on or about February 9, 1989, Jean prepared another letter in which he resigned his elected position as Financial Secretary. In that letter, Jean stated,

> I first want you to know that the President asking me to [resign] has not influenced me in any manner. After much thought and many requests from members of this local, I have decided to resign my position as Financial Secretary this 9th day of February [1989] in order that I may actively seek the office of President–Business Manager of this local without any conflict of interest being involved and no undue hardships put on any elected or appointed representative of this local.

In Local 150's regularly scheduled August, 1989, election, Dugan prevailed over Jean for the position of President–Business Manager.

On December 31, 1990, Jean filed a three-count complaint seeking damages and injunctive relief against Dugan. In Count I, Jean alleged defamation on the basis of various statements made by Dugan in 1988 and 1989. In Counts II and III, Jean raised employment-based claims, alleging retaliation and interference with contractual relations. The district court, applying Indiana law to all of Jean's claims, entered an order on February 26, 1993, granting summary judgment for Dugan on all three counts. With respect to Count I, the court held that Jean's claims based on statements made in 1988 were barred by Indiana's two-year statute of limitations for defamation actions. In addressing the allegedly defamatory statements made in 1989, the court concluded that Jean had not put forth sufficient evidence to raise a genuine issue of material fact. Finally, the court held that the employment claims raised in Counts II and III also were time-barred.

## II.

We review the grant of summary judgment *de novo*, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. *Cornfield by Lewis v. School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). If a party fails to establish

the existence of an essential element of its case on which it bears the burden of proof at trial, we will affirm the grant of summary judgment. In this situation, there can be " 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A.

In Count I of his complaint, Jean alleged defamation on the basis of various statements made by Dugan to union members in public meetings held in December 1988. In his Answers to Defendant's First Set of Interrogatories, Jean specifically identified several specific allegedly defamatory statements: (1) on December 15, 1988, Dugan announced to members attending a District 2 meeting in Joliet, Illinois, that Jean "sided with a contractor over a member and even plaintiff's wife is a witness for a contractor;" (2) in December 1988 or January 1989, an individual named Joe Ward told those assembled at a steward/craft foreman meeting in Portage, Indiana, that Jean "had made a deal and sided with a contractor to deprive a member of benefits;" (3) Dugan made various defamatory statements at the December 22, 1988, Executive Board Meeting; (4) Dugan authored defamatory articles in the January and March, 1989, editions of the *Local 150 Engineer;* (5) Dugan assisted in distributing the paper throughout Local 150's jurisdiction; (6) a Local 150 attorney, Bernard Baum, wrote defamatory statements to the Northwest Indiana Building Trades Council on January 23, 1989; (7) Dugan reaffirmed his own newspaper article at a January, 1989, general membership meeting in Countryside, Illinois; and (8) Dugan made or caused to be made various additional statements between 1989 and 1991. Of these allegations, Jean appears to continue to assert on appeal only (4), (5), and (7), and with good reason. Allegations (2) and (6) concern persons who are not parties to this litigation. Allegations (1) and (3), as Jean apparently concedes, are time-barred even under the most favorable statute of limitations that may be applicable

to this case. Finally, we would be hardpressed to review allegation (8) if Jean had advanced it on appeal because we cannot find, either in the record or in Jean's brief, any elaboration on the vague claim made therein.

### 1.

As a threshold matter we determine whether we must reconsider the district court's choice of law decision. This court has held that "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992). Where there is no disagreement among the contact states, the law of the forum state applies. *International Administrators v. Life Ins. Co.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). Here the district court, applying Indiana's choice of law rules, determined that the substantive law of Indiana, including Indiana's two-year statute of limitations, applied to Jean's defamation claim. *See Moser v. Universal Engineering Corp.*, 11 F.3d 720, 724 n. 6 (7th Cir.1993) ("State law barring an action because of a statute of limitations is sufficiently 'substantive' in the *Erie* sense that a federal court in that state exercising diversity jurisdiction must respect it."). On appeal, Jean apparently agrees that Indiana law applies here, thus conceding that some, but not all, of the allegedly defamatory statements are time-barred. Dugan, on the other hand, argues that we should apply Illinois law, with its one-year statute of limitations for defamation claims, to bar Count I in its entirety.

Because the choice between Indiana and Illinois law could make a difference in the outcome of this case, we must decide which applies here. A federal court hearing a case under diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). If the laws of more than one jurisdiction arguably are in issue, *Erie* also requires

a federal court to apply that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1307 (7th Cir.1993). Thus, sitting in Indiana, the district court properly looked to Indiana's choice of law rules.

■ As the district court observed, Indiana traditionally applied the *lex loci delicti* rule which directs courts to apply the tort law of the state in which the last event necessary to make an actor liable for the alleged tort took place. *Burns v. Grand Rapids and Indiana Railroad Co.*, 113 Ind. 169, 15 N.E. 230 (1888). In 1987, however, realizing that rigid adherence to this choice of law rule might lead to anomalous results, the Indiana Supreme Court adopted the "most significant contacts" approach. *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind.1987). As the *Hubbard* Court noted, in many cases the place of the tort will be significant and the place with the most contacts. *Id.* (citing *Lambert v. Yellowbird, Inc.*, 496 N.E.2d 406, 409 n. 2 (Ind.App. 1986)). In other cases, where the place of the tort bears little connection to the underlying legal action, courts may consider additional factors including: (1) the place where the conduct causing the injury occurred; (2) the residence or place of business of the parties; and (3) the place where the relationship is centered. *Id.* 515 N.E.2d at 1073–1074 (citing the *Restatement (Second) of Conflicts of Laws* § 145(2) (1971)). These factors should not be applied mechanically; rather, they are to be "evaluated according to their relative importance to the particular issues before the court." *Id.* at 1074.

All of Jean's extant defamation claims against Dugan (referred to as (4), (5), and (7) above) concern the publication, distribution, and reaffirmation of statements made by Dugan in the *Local 150 Engineer*. This fact is relevant to our initial choice of law consideration: the place of the alleged tort. In cases where, as here, the conduct at issue is publication, the place of injury is under most circumstances the place of publication. *Hoffman v. Roberto*, 578 N.E.2d 701, 705 (Ind. App.1991); *see also International Adminis-*

*trators*, 753 F.2d at 1377 n. 4; *Ginsburg v. Black*, 192 F.2d 823 (7th Cir.1951), *cert. denied*, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952). Here, because it is undisputed that publication occurred simultaneously in Illinois and Indiana (and Iowa as well), the place of the tort does not help us resolve which state has the most significant contacts. *Hoffman*, 578 N.E.2d at 705. We must, therefore, turn to the three-part test announced in *Hubbard*.

Applying this test, the district court relied on Jean's allegation that his reputation was injured most severely in Indiana, where Jean lived and primarily worked, in determining that Indiana law applied to Jean's defamation claims. Dugan submits that the first and third factors of the *Hubbard* test weigh in favor of applying Illinois law while the second factor favors neither side. According to Dugan, the conduct causing the injury occurred in Illinois by virtue of the fact that the allegedly defamatory articles not only were authored at Local 150's Countryside, Illinois, headquarters, but also were printed and distributed from there. Dugan further maintains that the parties' residence and place of business cancel each other out; Dugan has both in Illinois while Jean has both in Indiana. Finally, Dugan argues that the relationship between Jean and Dugan is centered in Illinois because both men were high-ranking officers of a union headquartered in Illinois.

Though Dugan's argument is not without merit, on balance, we agree with the district court that Indiana law applies here. We agree with Dugan's contention that the residence and place of business of the parties is a neutral factor. Though a close call, we also are inclined to view Illinois as the center of the parties' relationship for the reasons presented above. However, bearing in mind the *Hubbard* court's directive to evaluate the factors "according to their relative importance to the particular issues being litigated," 515 N.E.2d at 1074, we think it clear that "the place where the conduct causing the injury occurred" is the most significant factor and that it favors our application of Indiana law. Conceptually, defamation is an injury to reputation. *See Fleming Sales Co., Inc. v.*

*Bailey,* 611 F.Supp. 507, 517 (N.D.Ill.1985). As the district court found, Jean lived and primarily worked in Indiana; hence, the relevant community in which the alleged injury to his · reputation occurred also was in Indiana. Following from this, we conclude that the "conduct causing the injury" was not simply the publication of Dugan's articles, but, more precisely, their publication · *in Indiana.* Consequently, we apply Indiana defamation law.

### 2.

Indiana has a two-year limitations period for defamation claims. Ind.Code Ann. § 34–1–2–2(1) (West 1988). Jean brought his complaint on December 31, 1990; therefore, the district court correctly found that all of Jean's claims based upon· Dugan's allegedly defamatory statements made in 1988 were untimely. As to the remaining statements, the district court, applying an "actual malice" standard, granted summary judgment for Dugan because "Jean has not put forth even a scintilla of evidence which would suggest that Dugan believed his statements to be false or that he was recklessly indifferent to their truth or falsity." On appeal, Jean asserts the existence of a genuine issue of material fact such that summary judgment for Dugan was improper.

■ As a preliminary matter, we review the district court's decision to apply the "actual malice" standard to Jean's defamation claims. This standard descends from a long line of important defamation cases beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). While the United States Constitution does not require states to use "actual malice" as a touchstone when a plaintiff who is not a public figure or official seeks actual damages, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974);[6]

*Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1087 (7th Cir.1990), it is perfectly appropriate for states to give speakers greater protection than the United States Constitution requires. In *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 321 N.E.2d 580 (1974), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), a panel of the Indiana court of appeals did just that, holding that in Indiana even private figures must establish actual malice if the statements in question relate to an issue of public concern. As this court recognized in *Chang,* 900 F.2d at 1087, *Aafco* puts Indiana among a small minority of states that require private-figure plaintiffs to prove actual malice, a fact that has drawn some criticism from several Indiana judges. Nevertheless, we concluded in *Chang* that "*Aafco* is straightforward and, for the moment, the reigning expression of state law." *Id.* Jean has presented no cases, nor have we found any, that convince us to revisit this question. Thus, in light of *Aafco,* we need not decide whether Jean is a public figure;[7] the "actual malice" standard applies so long as the allegedly defamatory statements relate to issues of public concern. 321 N.E.2d at 590. Here we are persuaded that Dugan's statements satisfy this test because they arose from a dispute with a contractor over obligations to contribute to the union's fringe benefit funds and related to a serious disagreement between two elected officials of a large (both in membership and geographic expanse) local of a prominent labor union. Thus, under Indiana law, Jean could not prevail at trial without a showing of actual malice.

■ We now consider whether the actual malice standard applies on summary judgment. Though Indiana law controls the substantive issues in this diversity case, the

---

6. Contrary to well-established common law prevailing in the states, the *Gertz* Court held that a private plaintiff in a defamation action cannot recover for a published falsehood unless he proves that the defendant was at least negligent in publishing the falsehood. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 763, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (Burger, C.J., concurring in the judgment).

7. As a frequent and successful candidate for union office, he might be. *See Korbar v. Hite,* 43 Ill.App.3d 636, 2 Ill.Dec. 158, 357 N.E.2d 135 (1976) (finding that the local president of a steelworkers' union is a public figure under *New York Times v. Sullivan*), *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 98 (1977).

standard for deciding whether summary judgment was appropriate is a matter of federal law. *See Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir.1976); *see also McEwen v. Delta Air Lines, Inc.,* 919 F.2d 58, 60 (7th Cir.1990) ("Federal courts may grant summary judgment under Rule 56 on concluding that no reasonable jury could return a verdict for the party opposing the motion, even if the state would require the judge to submit an identical case to the jury."); *Woods v. Evansville Press Co., Inc.,* 791 F.2d 480, 485 (7th Cir.1986); *cf. Sokol Crystal Products, Inc. v. DSC Communications Corp.,* 15 F.3d 1427, 1431–33 (7th Cir.1994) (noting with some skepticism that in this circuit, for purposes of the *Erie* doctrine, state law governs the standard to be applied to a motion for judgment as a matter of law but federal law applies to motions for a new trial). In ruling on Rule 56(c) motions for summary judgment, the Supreme Court has directed trial judges to "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). We turn to state law to ascertain the substantive evidentiary burden, but, as we noted in *Chang,* Indiana's applies the same "actual malice" standard that prevails in the federal constitutional setting—namely, that "the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false." 900 F.2d at 1088; *see also Aafco,* 321 N.E.2d at 586. Applying this standard, a federal court ruling on a summary judgment motion must ask "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2515.[8]

Jean does not even allege that Dugan *knew* that his statement was false. Jean does contend, however, that Dugan published with reckless indifference. In essence, Jean asserts that the district court should have inferred malice from Dugan's unreasonable reliance on the truthfulness of Hebron officials' assertions that they were excused from contributing to the funds because of a deal made with Jean. In support of this contention, Jean first reminds us that Hebron was defending against a civil action to compel an audit and to collect the required contributions at the time the allegations against Jean surfaced. Jean then complains that Dugan offered no evidence of prior misconduct by Jean or of any basis for accepting Hebron's charges as reliable. Under these circumstances, Jean argues, Dugan was recklessly indifferent in preferring the contractor's representations over Jean's long established record.

In *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court of the United States clarified the meaning of "reckless disregard" of a statement's probable falsity. The test is not whether a reasonably prudent person would have published or would have investigated before publishing; rather, the evidence must show that the defendant in fact entertained serious doubts as to the truth of the statement but published in spite of his doubts. *Id.* at 731, 88 S.Ct. at 1325. To be sure, the defendant in a defamation action cannot automatically prevail merely by testifying or stating in an affidavit that he published with a belief that the statements were true. *Id.* at 732, 88 S.Ct. at 1326. Indeed, the *St. Amant* Court listed several examples of circumstances that might give rise to recklessness: (1) a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call; (2) the allegations are so inherently improbable that only a reckless man would have put them in circulation; or (3) there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. *Id.*

---

**8.** Of course, Indiana courts are not bound by federal decisions in construing their own state law on summary judgment motions. Under Indiana law, the clear and convincing evidence standard applies at trial, but not at the summary judgment stage. *Madison County Bank & Trust Co. v. Kreegar,* 514 N.E.2d 279 (Ind.1987); *Comfax v. North American Van Lines,* 587 N.E.2d 118, 128 (Ind.App.1992); *Chester v. Indianapolis Newspapers,* 553 N.E.2d 137, 140–141 (Ind.App. 1990). That Indiana's summary judgment requirements depart from the federal norm is of no moment here, however, because "*Erie* does not require a federal court to employ the state's rules on the allocation of issues between judge and jury." *McEwen,* 919 F.2d at 60.

As noted above, *infra* at 263, Indiana state law, in effect, has lifted the definition of actual malice from *St. Amant* and *New York Times*. *See Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1219 (1978); *Aafco*, 321 N.E.2d at 589–590 (holding that mere negligence or failure to investigate is not sufficient to establish actual malice under Indiana law).

Based on our independent review of the record, drawing all reasonable inferences in favor of Jean, *Brookins v. Kolb*, 990 F.2d 308, 312 (7th Cir.1993), we conclude that the evidence presented "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. It is clear from the record that Dugan's allegations were neither fabricated nor "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326. Union officials noted a deficiency in the fund contributions of one of their contractors and were given an explanation by that contractor. While there may have been "reasons to doubt the veracity of the informant or the accuracy of his reports," *id.*, the charges against Jean were neither anonymous nor unverified. Rather, Dugan discussed the charges with Jean on December 7, 1988, prior to the publication of Dugan's conclusions, which admittedly reflected unfavorably upon Jean. Even when reviewing what transpired at this meeting in the light most favorable to Jean, as we must here, it is clear that Jean informed Dugan (1) that he had notified owner operators, pursuant to instructions from a previous Financial Secretary, that they were not required to contribute to the union fringe benefits fund, and (2) that he had transferred union documents to a contractor because he thought he was under court order to do so. Even if, considering the source, Dugan initially should have doubted the veracity of Hebron's charges, we

are persuaded that his investigation, coupled with Jean's less than convincing response, establishes that the subsequent publication of the charges was not "reckless".[9] We also are aware that additional events transpired between the interview and the publication. In particular, Jean submitted two statements for publication in the January 1989 issue of the union newspaper, both of which, at least arguably, cast Dugan in an unfavorable light. Thus, Dugan's allegedly defamatory remarks were published at least with an eye toward responding to Jean's related charges. Viewing these circumstances as a whole, we find that no rational fact finder could find actual malice by clear and convincing evidence. Accordingly, we affirm the grant of summary judgment on Count I of Jean's complaint.

**B.**

■ We now turn our attention to the employment-related claims raised in Counts II and III of Jean's complaint. In Count II, Jean stated a claim for retaliatory discharge motivated by Jean's disagreement with Dugan's policies as Business Manager. In Count III, Jean alleged that Dugan "attempted to cause and did cause Local 150 not to honor its employment contract [with Jean] as a business representative," and constructively discharged Jean as Financial Secretary. In essence, Jean maintains that by discontinuing the payment of his salary, Dugan tortiously interfered with Jean's employment as Financial Secretary, a position to which Jean was elected for a three-year term. In response, Dugan asserts that the question of whether Jean was terminated as Business Manager or Financial Secretary is irrelevant because Jean's employment-related claims are barred by the applicable statute of limitations in any event.

The district court agreed that Jean's employment claims were barred under Indiana's

---

9. The district court granted Jean's motion to take judicial notice of the judgment entered in favor of Jean in *Hebron Plumbing and Heating, Inc. v. Virgil Jean and Williams Connors*, Cause No. 46C01–9009–CT–182, LaPorte Circuit Court, Indiana (Sept. 24, 1992). There, Hebron sued Jean, alleging that Jean fraudulently induced Hebron to execute a Memorandum of Agreement with Local 150 to the effect that Hebron would not be required to make contributions to the union fringe benefits fund. The court found for Jean on the fraud charge but did not make explicit findings with regard to whether Jean made a deal with Hebron or whether Jean admitted to Dugan that he had done so.

two-year statute of limitations for employment-related actions, finding that they had accrued on December 12, 1988, when Dugan said he would have to remove Jean from the payroll.

■ Again, we review the district court's grant of summary judgment for Dugan on Counts II and III under a *de novo* standard, drawing all reasonable inferences in favor of Jean. *Cornfield by Lewis*, 991 F.2d at 1320. Neither party contests on appeal the district court's decision to apply Indiana substantive law to these counts, including Indiana's statutes of limitations. Dugan submits that the district court selected the appropriate limitations period and applied it properly to bar Jean's employment-related claims.[10] Jean presents three arguments in support of his position that the district court erred, two of which he raises for the first time on appeal. First, Jean contends, as he did in the district court, that even if the two-year period applies, his claims should not be barred because the district court determined the date on which his underlying causes of action accrued erroneously. Second, he argues that the applicable limitations period is found in Indiana's ten-year statute for actions based on written contracts.[11] Finally, Jean submits that the limitations period should have been tolled because Dugan's non-residency in Indiana impeded the commencement of Jean's suit.[12] This court repeatedly has held, "it is axiomatic that arguments not raised below are waived on appeal." *Erff v. Markhon Industries, Inc.*, 781 F.2d 613, 618 (7th Cir.1986); *Libertyville Datsun Sales v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir.1985). Hence, Jean's second and third arguments sketched above are waived and will not be considered for the first time on appeal.

Whether Jean's employment claims are time-barred turns on the date of his termination. Dugan argued, and the district court agreed, that he terminated Jean on December 12, 1988, when he informed Jean that he was removed from the payroll and ordered Jean to return his union-owned credit card and car keys. Jean claims that these actions failed to demonstrate that, in fact, Dugan had committed the tort of removing Jean from the payroll, and, therefore, did not trigger the running of the limitations clock. In support of this view, Jean points to evidence in the record showing that Jean received his regular pay check about a week later and also received a Christmas bonus check. Jean concludes that the relevant tort—a violation of the Indiana wage payment laws—occurred, at the earliest, on January 10, 1989, and that the statute of limitations began running on that day.

■ We find Jean's argument unconvincing. Under Indiana law, it is well established that a cause of action accrues and the statute of limitations begins to run on a personal injury claim "when the injurious action occurs though the plaintiff may not learn of the act until later." *Tolen v. A.H. Robins Co., Inc.*, 570 F.Supp. 1146, 1149 (N.D.Ind.1983) (citing *Guy v. Schuldt et al.*, 236 Ind. 101, 138 N.E.2d 891 (1956)). As the Supreme Court of Indiana has explained, "For a wrongful act to give rise to a cause of action and thus to commence the running of the statute of limitations, it is not necessary that the extent of the damages be known or ascertainable but only that damage has occurred." *Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281, 289 (1981). The relevant injurious action in this case occurred when Dugan informed Jean that he was removed from the payroll and ordered Jean to surrender his union-owned car and credit card. Jean's compliance with Dugan's demand coupled with Jean's letter of December 16, 1988, acknowledging that "on December 12, 1988, President Bill Dugan fired me" as Business Representative, evidences Jean's understanding that some damage had occurred. The

---

10. Pursuant to Indiana Code Ann. § 34–1–2–1.5, "[a]ll actions relating to the terms, conditions, and privileges of employment except actions based upon a written contract (including, but not limited to, hiring or the failure to hire, suspension, discharge, discipline, promotion, demotion, retirement, wages, or salary) shall be brought within two (2) years of the date of the act or omission complained of."

11. Indiana Code Ann. § 34–1–2–2(6) provides a ten-year statute of limitations for actions based upon "contracts in writing."

12. Here Jean cites to Indiana Code Ann. § 34–1–2–6(a).

fact that Jean may not have appreciated the full consequences of Dugan's actions until he failed to receive a scheduled paycheck in early January may be relevant to the *extent* of the damages, but it does not alter our conclusion that a significant and potentially tortious act occurred on December 12, 1988.

Under Indiana law, "[a]ll actions relating to the terms, conditions, and privileges of employment ... shall be brought within two (2) years of the date of the act or omission complained of." Ind.Code Ann. § 34–1–2–1.5. In this case, we hold that the "act or omission complained of" was Dugan's December 12, 1988, termination of Jean, effected by removing Jean from the payroll and demanding the return of union-owned property. The record clearly shows that Jean delayed filing suit until December 31, 1990. Jean's employment claims were thus time-barred, and the district court properly granted summary judgment for Dugan.[13]

### III.

"Statutes of limitations ... represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' " *Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944); *Diliberti v. United States*, 817 F.2d 1259, 1263 n. 3 (7th Cir.1987). In this diversity case, applying Indiana law, we agree with the district court's conclusion that all of Jean's employment-based claims and some of his defamation claims were barred by the applicable statutes of limitations. In regard to Jean's remaining defamation claims, we concur in the district court's determination that Jean failed to adequately allege "actual malice" on the part of Dugan. For these reasons, the district court's grant of summary judgment for Dugan on all counts of the complaint is

AFFIRMED.

---

**13.** In deciding when Jean's cause of action accrued, the district court reached the correct result while erroneously relying upon federal law. *See Jean v. Dugan*, 814 F.Supp. 1401, 1411.